ACCEPTED
03-16-00358-CV
12962802
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/28/2016 7:58:24 PM
JEFFREY D. KYLE
CLERK

## No. 03-16-00358-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
9/28/2016 7:58:24 PM
JEFFREY D. KYLE
Clerk

PATRICIA MOSLEY,
*Appellant/Cross-Appellee*,

*V.*

TEXAS HEALTH AND HUMAN SERVICES COMMISSION AND TEXAS DEPARTMENT OF
FAMILY AND PROTECTIVE SERVICES,
*Appellees/Cross-Appellants*.

ON APPEAL FROM THE 201ST JUDICIAL DISTRICT COURT,
TRAVIS COUNTY, TEXAS, CAUSE NO. D-1-GN-15-001024

## APPELLANT'S INITIAL BRIEF

BAKER BOTTS L.L.P.

98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701-4078
512.322.2500 (phone)
512.322.2501 (fax)

Kevin E. Vickers
State Bar No. 24079517
kevin.vickers@bakerbotts.com

Paulina Williams
State Bar No. 24066295
paulina.williams@bakerbotts.com

Samia R. Broadaway
State Bar No. 24088322
samia.broadaway@bakerbotts.com

ATTORNEYS FOR PATRICIA MOSLEY                September 28, 2016

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Rule 38.1(a) of the Texas Rules of Appellate Procedure, the following is a complete list of all parties to the trial court's order appealed from, and the names and addresses of all trial and appellate counsel.

**Appellant/Cross-Appellee:** Patricia Mosley

Appellant's/Cross-Appellee's Counsel:

Kevin E. Vickers
State Bar No. 24079517
kevin.vickers@bakerbotts.com
Paulina Williams
State Bar No. 24066295
paulina.williams@bakerbotts.com
Samia R. Broadaway
State Bar No. 24088322
samia.broadaway@bakerbotts.com
Baker Botts, L.L.P.
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701-4078
512.322.2500 (phone)
512.322.2501 (fax)

**Appellees/Cross-Appellants:** Texas Health and Human Services Commission, and Texas Department of Family and Protective Services

Appellees'/Cross-Appellants' Counsel:

Andrew Lutostanski
State Bar No. 24072217
andrew.lutostanski@texasattorneygeneral.gov
Assistant Attorney General
Office of the Attorney General of Texas
Administrative Law Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
512.475.4200 (phone)
512.320.0167 (fax)

i

Identity of Parties and Counsel ................................................................ i

Index of Authorities ............................................................................... iv

Statement of the Case............................................................................ vii

References to the Record ...................................................................... viii

Abbreviations...................................................................................... viii

Issue Presented...................................................................................... ix

Did the Texas Health and Human Services Commission ("HHSC") err when it concluded that Appellant Patricia Mosley committed "reportable conduct," thereby requiring that Ms. Mosley be listed on the Employee Misconduct Registry ("EMR") and forever banned from employment in facilities regulated by the Texas Department of Aging and Disability Services ("DADS")?

Statement of the Facts..............................................................................1

I.   Ms. Mosley was assigned to the H\*\* Home where AW resides. ....................1

II.  Ms. Mosley was assigned to care for AW alone when the incident occurred. ......................................................................................3

III. The DFPS ordered that Ms. Mosley be placed on the Employee Misconduct Registry, and Ms. Mosley sought review....................................6

Standard of Review ..................................................................................8

Summary of the Argument........................................................................9

Argument................................................................................................12

I.   Background on group homes and the Employee Misconduct Registry.........12

II.  "Reportable conduct" is a defined term that requires "a negligent act or omission" and consideration of circumstances, ordinary prudence, and the reasonableness of the worker's conduct in light of foreseeable risks......15

III. Point of Error 1.   The HHSC erred in finding that Ms. Mosley committed "neglect" because the record does not contain substantial evidence to support the finding of negligence, a required component of neglect. ..............................................................................................17

A.  Ms. Mosley did not commit negligence because it was impossible to maintain one-to-one supervision within arm's-length distance, when staffed alone with AW for nearly seven hours...........................................18

B. Given the absence of symptoms or threats in the days and hours beforehand, AW's secretive conduct at the time of the incident was not foreseeable, and therefore Ms. Mosley's conduct did not constitute neglect. ...................................................................................21

    1. Ms. Mosley's prudence was required to be that of an ordinary worker in a field requiring only basic skills and training. .................23

    2. AW's Treatment Plans do not convey to the ordinary worker that AW would surreptitiously engage in self-harm without warning. ...................................................................................24

    3. Ms. Mosley's personal observations and experience at the H** Home did not suggest AW would behave subtly, secretively, or without warning. .......................................................................26

    4. Symptoms that correlate with AW's dangerous behaviors were wholly absent in the days and hours prior to the February 14, 2014, incident. ...........................................................................29

IV. Point of Error 2. The HHSC erroneously applied a strict liability standard given lack of substantial evidence on duration out of arm's length. ...............................................................................................33

A. The record lacks substantial evidence regarding the actual duration that AW was out of arm's length, an essential underlying fact for foreseeability and the conclusion that neglect occurred. ...........................33

B. The HHSC thus failed to apply its own "negligence" standard, erroneously holding Ms. Mosley to a strict liability standard. ................35

V. Point of Error 3. The HHSC erred in finding Ms. Mosley caused or may have caused harm. ........................................................................37

Conclusion and Prayer ..................................................................................40

Certificate of Compliance ............................................................................42

Certificate of Service ...................................................................................42

Index to Appendix ........................................................................................43

**Cases**

*Citizens Against Landfill Location v. Tex. Comm'n on Envtl. Quality*,
169 S.W.3d 258 (Tex. App.—Austin 2005, pet. denied) .....................................8

*Cont'l Imports, Ltd. v. Brunke*,
03-10-00719-CV, 2011 WL 6938489 (Tex. App.—Austin Dec. 30, 2011, pet.
denied) ...............................................................................................................35

*Del Lago Partners, Inc. v. Smith*,
307 S.W.3d 762 (Tex. 2010) .................................................................. 22, 23, 32

*Dyess v. Harris*,
321 S.W.3d 9 (Tex. App.—Houston 2009, pet. denied) ............................. 22, 36

*Ehlers v. State*,
756 N.W.2d 152 (Neb. 2008) ..............................................................................30

*El Chico Corp. v. Poole*,
732 S.W.2d 306 (Tex. 1987) ..............................................................................22

*Great Atl. & Pac. Tea Co. v. Evans*,
175 S.W.2d 249 (Tex. 1943) ..............................................................................22

*Home Care Assoc. of Am. v. Weil*,
799 F.3d 1084 (D.C. Cir. 2015) ............................................................... 14, 24

*Jackson v. Axelrad*,
221 S.W.3d 650 (Tex. 2007) .................................................................. passim

*Kroger Co. v. Elwood*,
197 S.W.3d 793 (Tex. 2006) ..............................................................................37

*Lamb Cty. Elec. Co-op., Inc. v. Pub. Util. Comm'n of Tex.*,
269 S.W.3d 260 (Tex. App.—Austin 2008, pet. denied) ....................................34

*Martin v. Tex. Dep't of Pub. Safety*,
964 S.W.2d 772 (Tex. App.—Austin 1998, no pet.) ............................................9

*McClure v. Allied Stores of Tex., Inc.*,
608 S.W.2d 901 (Tex. 1980) .................................................................... 37, 39

*Perez v. Lopez*,
74 S.W.3d 60 (Tex. App.—El Paso 2002, no pet.) ...................................... 22, 29

*Pub. Util. Comm'n of Tex. v. Gulf States Utils. Co.*,
809 S.W.2d 201 (Tex. 1991) ..............................................................................36

*Rio Grande Reg'l Hosp., Inc. v. Villarreal*,
329 S.W.3d 594 (Tex. App.—Corpus Christi 2010, pet. granted, judgm't vacated
w.r.m.)................................................................................................................32

*Tex. Dep't of Pub. Safety v. Fecci*,
  989 S.W.2d 135 (Tex. App.—San Antonio 1999, pet. denied) .............................8

*Tex. Health Facilities Comm'n v. Charter Medical-Dallas, Inc.*,
  665 S.W.2d 446 (Tex. 1984) ...............................................................................34

*Tex. Home Mgmt., Inc. v. Peavy*,
  89 S.W.3d 30 (Tex. 2002) ...................................................................................21

*Thompson v. Gibson*,
  298 S.W.2d 97 (Tex. 1957) ...................................................................... 15, 18, 21

*Timberwalk Apartments, Partners, Inc. v. Cain*,
  972 S.W.2d 749 (Tex. 1998) ..................................................... 23, 26, 28, 30

*Torrington Co. v. Stutzman*,
  46 S.W.3d 829 (Tex. 2000) .................................................................................23

**Statutes**

42 U.S.C. § 10801 ................................................................................................17

Tex. Gov't Code § 2001.174................................................................... passim

Tex. Health & Safety Code § 253.0075 ...............................................................14

Tex. Health & Safety Code ch. 253 .....................................................................14

Tex. Hum. Res. Code § 48.001 ............................................................................14

Tex. Hum. Res. Code § 48.251 ............................................................................15

Tex. Hum. Res. Code § 48.401 ................................................................. 7, 15, 37

Tex. Hum. Res. Code § 48.402 ............................................................................15

Tex. Hum. Res. Code § 48.403 ............................................................................15

Tex. Hum. Res. Code § 48.406 ..............................................................................8

Tex. Hum. Res. Code ch. 48, subchapter I ..........................................................14

**Other Authorities**

20 Tex. Reg. 3830 (May 23, 1995) ......................................................................17

53 Tex. Jur. 3d *Negligence* § 23 (2014)...............................................................36

*Employee Misconduct Registry FAQs*, TEXAS DEPARTMENT OF AGING AND
  DISABILITY SERVICES,
  https://www.dads.state.tx.us/providers/nf/credentialing/emr/faq_emr.html (last
  visited Sept. 20, 2016) ..........................................................................................1

*Fact Sheet: Home and Community-based Services*, TEXAS DEPARTMENT OF AGING
  AND DISABILITY SERVICES, https://www.dads.state.tx.us/services/faqs-
  fact/hcs.html (last visited Sept. 20, 2016) ..........................................................12

H.R. REP. NO. 99-576 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1377 ...................17

Neil S. Butler, *"In the Most Appropriate Setting": The Rights of Mentally Disabled Individuals Under the Americans with Disabilities Act in the Wake of Olmstead v. L.C.*, 49 Cath. U.L. Rev. 1021 (2000)................................................12

S. REP. NO. 99-109 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1361.................. 13, 17

Sen. Research Ctr., Bill Analysis, Tex. S.B. 967, 76th Leg., R.S. (1999) . 12, 13, 24

**Regulations**

40 Tex. Admin. Code § 711.1402 (2015)................................................................12

40 Tex. Admin. Code § 711.1406 (2015).................................................. 15, 18, 38

40 Tex. Admin. Code § 711.19 (2015) ........................................................... 16, 38

40 Tex. Admin. Code § 9.153........................................................................................12

40 Tex. Admin. Code § 9.158.........................................................................................2

40 Tex. Admin. Code § 9.159.........................................................................................2

40 Tex. Admin. Code § 9.163.........................................................................................2

40 Tex. Admin. Code § 94.12.........................................................................................1

**STATEMENT OF THE CASE**

*Nature of the Case*:     Ms. Patricia Mosley sued in Travis County district court, seeking judicial review of a final ordered, issued February 12, 2015, by the Texas Health and Human Services Commission ("HHSC") in Cause No. 14-0474-M and EMR No. 039-14.  The HHSC's final order directs the Texas Department of Family and Protective Services ("DFPS") to submit Ms. Mosley's name and other identifying information to the Department of Aging and Disability Services ("DADS") for inclusion in the Employee Misconduct Registry ("EMR" or "Registry") pursuant to Texas Human Resources Code section 48.408.  CR 216-224.  The HHSC and DFPS filed a plea to the jurisdiction and argued that the HHSC's final order should be affirmed by the district court.  CR 72-108.

*Trial court and judge*:     The Honorable Darlene Byrne, presiding in the 201st Judicial District Court, Travis County, Texas

*Disposition below*:     The district court denied the HHSC's and DFPS's plea to the jurisdiction and affirmed the HHSC final order.  CR 260.

**REFERENCES TO THE RECORD**

AR [Volume]:[Page][(Lines)]          Administrative Record

CR [Page]                            Clerk's Record

**ABBREVIATIONS**

BSP                                  Behavior Support Plan

COL                                  Conclusion of Law

DADS                                 Texas Department of Aging and
                                     Disability Services

DFPS                                 Texas Department of Family and
                                     Protective Services

EMR                                  Employee Misconduct Registry

FOF                                  Finding of Fact

HCS                                  Home- and Community-based Service

HHSC                                 Texas Health and Human Services
                                     Commission

**ISSUE PRESENTED**

Did the Texas Health and Human Services Commission ("HHSC") err when it concluded that Appellant Patricia Mosley committed "reportable conduct," thereby requiring that Ms. Mosley be listed on the Employee Misconduct Registry ("EMR") and forever banned from employment in facilities regulated by the Texas Department of Aging and Disability Services ("DADS")?

Ms. Patricia Mosley has supported herself as a care worker for more than 15 years, and has done so without incident. AR 2:24(21), 2:54(6-9), 2:236(15-17) (Mosley testimony). Ms. Mosley now faces a *permanent ban* on her ability to support herself by working in DADS-regulated facilities or agencies[1] based on the HHSC's finding of a single, momentary distraction that occurred on February 14, 2014, while Ms. Mosley was caring for a unique and particularly challenging individual, "AW."[2] AR 1:0033 (HHSC Final Order, Finding of Fact ("FOF") 5).

## I.  Ms. Mosley was assigned to the H** Home where AW resides.

Ms. Mosley began working for Doubletree Residential Services ("Doubletree") in the spring of 2013, AR 2:24(15-16), primarily in a home- and community-based service ("HCS") facility that housed consumers who were lower functioning or otherwise dissimilar from AW. AR 2:37(5-7), 2:124(10-15), 2:232(8-11). Beginning mid-January 2014, Ms. Mosley was assigned to a group

---

[1] These facilities include: nursing facilities; intermediate care facilities for individuals with an intellectual disability or related condition that are licensed by DADS; assisted living (personal care) facilities; adult foster care (Type C) facilities; adult day care facilities; hospices; and home and community support services agencies. The bar to employment also applies to unlicensed employees who provide the following services to residents or consumers of DADS-licensed long-term care facilities and agencies: direct care services (direct care services include eating, bathing, dressing, and ambulatory services and assistance to residents); personal care services; active treatment; and any other services. *Employee Misconduct Registry FAQs*, TEXAS DEPARTMENT OF AGING AND DISABILITY SERVICES, https://www.dads.state.tx.us/providers/nf/credentialing/emr/faq_emr.html (last visited Sept. 20, 2016). EMR listing also results in revocation of nurse-aide certification. 40 Tex. Admin. Code § 94.12(j).

[2] In order to protect her privacy, the individual receiving direct care from Ms. Mosley at the time of the occurrences relevant to the HHSC's Final Order is referred to herein by the initials "AW."

home located on H** Drive ("H** Home").[3] AR 2:30(16). H** Home was an HCS facility that housed three consumers, including AW. AR 2:132(10-14).

AW was designated as "Level of Need 9" and needed one-on-one supervision. AR 1:0144; *see* 40 Tex. Admin. Code § 9.163. AW is a middle-aged, mentally ill individual with a history of self-harming behavior and suicide attempts, including swallowing foreign objects. AR 1:0144-0149 (Behavior Support Plan ("BSP")). Family Eldercare, Inc. was her guardian of the person, with full authority. AR 1:0120. Family Eldercare, Inc. placed her at the H** Home following periods in state hospitalization and various "board and care" homes, and after no Intermediate Care Facility would accept AW. AR 1:0145 (BSP). Despite her history, AW was regarded as "very high functioning." AR 1:0100 (Nurse's Statement).

AW's care was guided by several DADS-regulated plans. *See, e.g.*, 40 Tex. Admin. Code §§ 9.158(j)(4), 9.159. AW's Level 9 Behavior Support Plan provided for "one-to-one supervision with staff within arm's length during waking hours and line-of-sight supervision during sleeping hours." AR 1:0147 (BSP). However, in practice, the H** Home staff afforded AW limited privacy in the bathroom, allowing her to go in alone but with the door cracked. AR 2:161(6-16) (Desiree Garcia testimony).

---

[3] The full name of the house is not used in case this information might be considered identifying of AW.

According to her Behavior Support Plan, AW's dangerous behavior "correlates with reports she is hearing voices and subsequent threats to harm herself," and the "Baseline" behavior description focuses on AW "making threats to harm herself," "threatening staff," and "threatening to kill herself." AR 1:0145 (BSP). Further, AW's Person-Directed Plan indicates the "symptom" of "hearing voices." AR 1:0125 (Person-Directed Plan).

AW's Person-Directed Plan, dated December 2, 2013, states AW was "doing a good job of being safe. AW will turn to staff for comfort when she gets upset or scared at night due to bad dreams." AR 1:0125. Though the Person-Directed Plan specifically has a field to "[i]dentify any needs, requests or considerations specific to this service that are necessary for the staff to know when supporting the individual in achieving his/her outcomes," Doubletree did not identify any additional considerations, such as evasive behavior. AR 1:0124-0130. According to AW's case manager, Josie Vargas, "[AW] will go several months without any incidents of suicidal ideations." AR 1:0053 (Investigative Report).

## II. Ms. Mosley was assigned to care for AW alone when the incident occurred.

For her first 30 days working at H** Home, Ms. Mosley regularly cared for the two other consumers in the house, and had very limited experience with AW. AR 2:30(1-2, 16). She was asked only twice to provide care for AW, and on both occasions she was accompanied by other Doubletree staff members experienced in

3

caring for AW. AR 2:30(1-9). Her training did not include AW's individual specific needs, Treatment Plans, or medication training. AR 2:58(15)-59(7); *see also* AR 2:126(19)-127(6) (Theresa Faller-Gerrenhaw testimony), 2:189(21-24) (Nurse's testimony), 2:27(1-22) (Mosley testimony), 2:52(23)-53(1) (Mosley testimony). During the time Ms. Mosley worked at the H** Home, AW had not demonstrated any self-harming or suicidal behaviors. AR 2:83(21-25) (Mosley testimony). As reflected in the Service Delivery Logs dated February 10 to 13, 2014, in the days leading up to February 14, 2014, AW did not make any reports of hearing voices or any threats to herself or others, or otherwise exhibit any emotional outbursts. AR 1:0150-0156.

On February 14, 2014, the H** Home's manager was injured and another regular worker was out. AR 2:32(1-6) (Mosley testimony). Doubletree asked Ms. Mosley to work an extra shift to care for AW. AR 2:32(1-6). A dedicated worker eager to help, Ms. Mosley agreed. AR 2:45(14-19) (Mosley testimony). AW was recovering from a stomach bug and a rash, so she stayed home from the day-rehabilitation program she generally would have attended. AR 1:0059. As a result, Ms. Mosley was left to care for AW alone—for the first time—from approximately 8:30 a.m. to approximately 3:15 p.m. AR 1:0061, 0070. Leaving any worker alone with AW—even an experienced worker—was unprecedented. AR 2:162(7)-163(24) (Desiree Garcia testimony).

4

AW slept for much of the morning and into the early afternoon. AR 1:0059 (AW statement), 1:0060 (Mosley statement). When she arose around 2:00 p.m., she and Ms. Mosley stepped outside for fresh air. AR 1:0055 (Nurse's statement), 2:72(19)-73(8), 2:100(19-20). As they came inside, fellow Doubletree employee Desiree Garcia called the landline at the H** Home to inquire whether the staff's paychecks had arrived. AR 1:0061, 2:153(1-3) (Desiree Garcia testimony). AW answered and, upon request, gave the phone to Ms. Mosley. AR 1:0061. According to Ms. Mosley, the phone call lasted two minutes at most, AR 2:10(25)-11(1) (Mosley testimony); according to Ms. Garcia, it lasted "about five or six minutes," inclusive of the time she spoke with AW. AR 1:0060 (Desiree Garcia statement), 2:152(22)-153(3) (Desiree Garcia testimony). At some point during the conversation, AW walked out of the living room and down the hall toward the restroom. AR 2:81(4-19). When Ms. Mosley hung up the phone and rounded the corner from the living room to reestablish arm's length supervision, AR 2:82(17)-83(7) (Mosley testimony), AW was in the bathroom with the door cracked—exactly where AW had indicated she wanted to go prior to the phone ringing. AR 2:81(4-8), 83(2-7) ("I'm thinking she's just probably rushing to go use the bathroom, because she told me that's where she was going . . . before the phone range [sic].") (Mosley testimony).

Ms. Mosley and AW continued their day together, without AW indicating that anything was wrong. AR 1:0061. In the mid-afternoon, the two went with other consumers and staff to the Dollar Tree store where AW bought a greeting card. AR 1:0061. Later that evening, AW pulled the visiting nurse aside and revealed that, earlier in the day, she had removed two batteries from her housemate's remote control and swallowed them. AR 2:182(18-20) (Nurse's testimony). The housemate's bedroom was located immediately adjacent to the bathroom and contained a remote control with unsecured batteries on a table within reach of the doorway. AR 2:68(22)-69(6). AW was in no discomfort, AR 1:0182-0184, 1:0056, and was taken to the emergency room at South Austin Medical Center, where doctors removed the batteries through her mouth. AR 1:0186. The primary risk, if the batteries were not removed, was the possibility that the batteries could cause a blockage which then might cause a bowel perforation. AR 1:0093. AW returned home that same night. AR 1:0057.

After the incident, Doubletree immediately removed Ms. Mosley from the H** Home staff. *See* AR 1:0169, 1:0091.

## III. The DFPS ordered that Ms. Mosley be placed on the Employee Misconduct Registry, and Ms. Mosley sought review.

The Texas Department of Family and Protective Services ("DFPS") investigated and concluded Ms. Mosley committed "reportable conduct" and would be placed on the Employee Misconduct Registry ("EMR") maintained by

DADS. AR 1:0001. Ms. Mosley timely requested an administrative appeal hearing. AR 1:0006. After the hearing, the presiding HHSC Administrative Law Judge issued a Final Decision and Order sustaining DFPS's determination that Ms. Mosley committed reportable conduct. AR 1:0029 (Final Order). The term "reportable conduct" is defined to include "neglect that causes or may cause death or harm to an individual[.]" Tex. Hum. Res. Code § 48.401(5)(A). The HHSC concluded that, because Ms. Mosley "failed to maintain one-to-one supervision within arms-length distance of AW—as required by AW's treatment plan—thus enabling AW to remove and swallow batteries, placing her at risk of physical injury such as bowel obstruction or perforation, Petitioner committed neglect," and that the neglect "caused or may have caused AW risk of harm." AR 1:0035 (Final Order, Conclusion of Law ("COL") 9, 10). It ordered DFPS to submit Ms. Mosley's name and other identifying information to DADS for inclusion in the EMR, pursuant to Texas Human Resources Code section 48.408. AR 1:0035 (Final Order, COL 11).

Ms. Mosely sought judicial review of the HHSC Final Order. The trial court affirmed the HHSC Final Order, CR 260, and Ms. Mosley appealed to this Court. CR 261-63.

7

## STANDARD OF REVIEW

Judicial review of the HHSC Final Order is under the substantial evidence rule. Tex. Hum. Res. Code § 48.406(c)(2). "Substantial evidence review presents a question of law." *Tex. Dep't of Pub. Safety v. Fecci*, 989 S.W.2d 135, 139 (Tex. App.—San Antonio 1999, pet. denied) (citing *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984)). This Court reviews the trial court's conclusion *de novo*. *Id.* (citing *In re Humphreys*, 880 S.W.2d 402, 404 (Tex. 1994)). This Court "shall reverse or remand the case for further proceedings if the substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are" affected by error of law, not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole, or arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. Tex. Gov't Code § 2001.174(2)(D), (E), and (F). This Court should "review the evidence as a whole to determine if it is such that reasonable minds could have reached the same conclusion as the agency[.]" *Citizens Against Landfill Location v. Tex. Comm'n on Envtl. Quality*, 169 S.W.3d 258, 264 (Tex. App.—Austin 2005, pet. denied). Under the substantial evidence rule, this Court should review legal determinations by the Administrative Law Judge *de novo* and

review any findings of fact for support by substantial evidence.  *Martin v. Tex.*

*Dep't of Pub. Safety*, 964 S.W.2d 772, 774 (Tex. App.—Austin 1998, no pet.).

SUMMARY OF THE ARGUMENT

The HHSC's finding of "reportable conduct," which forms the basis for its permanent ban, requires finding both neglect and causation, both of which are unsupported by the record evidence and the proper application of law.

**Point of Error 1.**  The HHSC erred in finding that Ms. Mosley committed "neglect" because the record does not contain substantial evidence to support the finding of negligence, a required component of neglect.  Neglect is defined as a *negligent* act or omission, thereby incorporating the standard of a reasonably prudent person and the need for any injury to be foreseeable to such a reasonable person under the facts and circumstances at the time.

Ms. Mosley was left by her employer to care for AW without any help whatsoever for nearly seven hours.  Given these circumstances, acting as a reasonably prudent person, it was impossible for Ms. Mosley to maintain one-to-one arm's-length supervision.  No reasonable mind could conclude otherwise.  The HHSC Final Order does not properly apply a negligence test, instead the Final Order penalizes Ms. Mosley for failing to do the impossible: monitor a consumer within arm's length for hours without any support.

9

Additionally, HHSC's record evidence fails to establish that Ms. Mosley knew or should have known that AW would exploit a moment out of arm's reach to engage in self-harming behavior in a surreptitious, non-obvious manner, without any advance symptoms or indication of distress. Although AW received one-to-one supervision for self-harming behavior, the Behavior Support Plan and Person-Directed Plan indicate that her self-harming behavior would reasonably "correlate" with indicia that were wholly absent on February 14, 2014, and the documented days beforehand. Thus, what a reasonably prudent person, such as Ms. Mosley, would have anticipated based on the record evidence does not support a finding of foreseeability and therefore negligence and neglect. Finding of Fact 8 is not supported by substantial evidence, and Conclusions of Law 9, 10, and 11 are thus made by error of law and are arbitrary and capricious.

**Point of Error 2.** The HHSC erred in finding that Ms. Mosley committed neglect because the HHSC failed to make any finding as to the time AW spent out of arm's length, an essential fact for any assessment of foreseeability. The HHSC equated the momentary distraction from arm's-length supervision to "neglect," based on *any* divergence from the treatment plan—not based on a review of the reasonableness of Ms. Mosley's actions against the actual surrounding facts and circumstances. Absent credible record evidence on this key fact—duration—the HHSC's finding of foreseeability lacks foundation in substantial record evidence.

10

To hold that *any* period out of arm's reach constitutes neglect ignores the plain and binding definition of "neglect" as negligence and transforms the standard into a strict liability regime. Finding of Fact 8 is not supported by substantial evidence, and Conclusions of Law 9, 10, and 11 are thus made by error of law and are arbitrary and capricious.

**Point of Error 3.** The HHSC erred in finding that Ms. Mosley "caused or may have caused AW risk of harm," which is a required element of "reportable conduct." Foreseeability comprises an essential element of proximate cause and is wholly lacking in this case. Therefore, Ms. Mosley's momentary distraction from arm's-length supervision cannot properly be deemed the cause of harm. No findings were made that Doubletree had an "appropriate" treatment plan to begin with. This, coupled with Doubletree's failure to fully train Ms. Mosley before staffing her in a highly unusual circumstance—alone with AW in a home with ready access to remote controls with batteries, caused Ms. Mosley to face the unforeseeable risks of AW's conduct. In addition, there are no findings that AW could not or did not secure or swallow the batteries while in arm's length; thus it cannot be determined that Ms. Mosley's momentary distraction was the cause in fact of the harm to AW. Finding of Fact 8 is not supported by substantial evidence, and Conclusions of Law 9, 10, and 11 are thus made by error of law and are arbitrary and capricious.

## I.   Background on group homes and the Employee Misconduct Registry

AW was placed with Doubletree at a home- and community-based services ("HCS") facility.  An HCS facility is a "person or an agency exempt from licensure under § 142.003(a)(19), Health and Safety Code, that provides home and community-based services to persons with intellectual disabilities and related conditions."  40 Tex. Admin. Code § 711.1402(12) (2015); *see also id.* § 9.153(24).  The HCS program provides individualized services and support in people's own homes or in other community settings, such as small group homes where no more than four people live.  *Fact Sheet: Home and Community-based Services*, TEXAS DEPARTMENT OF AGING AND DISABILITY SERVICES, https://www.dads.state.tx.us/services/faqs-fact/hcs.html (last visited Sept. 20, 2016).  Consistent with the nationwide move toward deinstitutionalization of, or care in the least restrictive environment for, the disabled and mentally ill, Texas has seen "rapid growth of adult day care facilities, intermediate care facilities for the mentally retarded and personal care homes," including such HCS facilities.  Sen. Research Ctr., Bill Analysis, Tex. S.B. 967, 76th Leg., R.S. (1999); *see also* Neil S. Butler, *"In the Most Appropriate Setting": The Rights of Mentally Disabled Individuals Under the Americans with Disabilities Act in the Wake of Olmstead v. L.C.*, 49 Cath. U.L. Rev. 1021, 1024 (2000) (describing gradual

decline in the systematic isolation of mentally ill individuals from the rest of the population through deinstitutionalization and additional changes under the Americans with Disabilities Act). A major driver of deinstitutionalization was increased awareness of the abhorrent conditions and extensive histories of abuse and neglect often found in large institutions. *See, e.g.*, S. REP. NO. 99-109, at 8 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1361, 1368 ("While developmentally disabled, mentally retarded and mentally ill individuals often have very different client service needs, the types of abuse and neglect to which these groups are subjected in treatment facilities may be very similar, particularly in such areas as overuse or misuse of restraints and seclusion, inappropriate use of medication, and the lack of implementation of treatment plans.").

With the proliferation of services provided in smaller settings, the EMR was established in 1999 under Texas Health and Safety Code section 253.007. The Texas Legislature created this mechanism to track findings of "reportable conduct" by "uncredentialed employees providing 'nurse aide-like' direct care services" at long-term care facilities, similar to one function of the nurse aide registry. Sen. Research Ctr., Bill Analysis, Tex. S.B. 967, 76th Leg., R.S. (1999). Chapter 48 of the Human Resources Code and the implementing regulations in 40 Texas Administrative Code chapter 711 provide the substantive standards and procedures by which to evaluate whether to place a particular worker on the EMR. Tex. Hum.

Res. Code ch. 48, subchapter I; Tex. Health & Safety Code § 253.0075. Placement on the EMR results in a permanent ban from employment in DADS-regulated facilities. *See* Tex. Health & Safety Code ch. 253 (creating EMR with no time limit or ability to take corrective action). These statutory and regulatory provisions support the laudable functions of investigating allegations of abuse, neglect, or exploitation of the elderly and disabled and providing protective services, as necessary. Tex. Hum. Res. Code § 48.001. The EMR, thus, forms one part of a system designed to protect consumers in deinstitutionalized settings. Its purpose is not to punish employees but to *better* the care for consumers—a goal undermined if the EMR is not used with sufficient caution so that it creates unnecessary turnover in the direct-care field. *Cf. Home Care Assoc. of Am. v. Weil*, 799 F.3d 1084, 1093, 1096 (D.C. Cir. 2015) (observing that in electing to expand the minimum wage to this class of workers, the Department of Labor found that "stabilizing the direct care workforce will result in better qualified employees, lower turnover, and a higher quality of care") (citing Application of the Fair Labor Standards Act to Domestic Service, 78 Fed. Reg. 60,454, 60,459-60 (Oct. 1, 2013)).

**II. "Reportable conduct" is a defined term that requires "a negligent act or omission" and consideration of circumstances, ordinary prudence, and the reasonableness of the worker's conduct in light of foreseeable risks.**

The lifetime ban of the EMR requires a finding that the employee committed "reportable conduct." Tex. Hum. Res. Code § 48.403. By statute, "reportable conduct" includes "abuse or neglect that causes or may cause death or harm to an individual receiving agency services." *Id.* § 48.401(5)(A).

The statute requires DFPS to adopt a definition of "neglect." *Id.* §§ 48.251(b), .402. Pursuant to DFPS's regulation applicable to this case, the relevant definition of "neglect" is:

> *a negligent act or omission* by any individual responsible for providing services to a person served, which caused or may have caused physical or emotional injury or death to a person served or which placed a person served at risk of physical or emotional injury or death.

40 Tex. Admin. Code § 711.1406(3) (2015) (emphasis added).[4]

Negligence means the doing of something that a person of ordinary prudence would not have done, or the failure to do something that a person of ordinary prudence would have done, under the same or similar circumstances. *Thompson v. Gibson*, 298 S.W.2d 97, 105 (Tex. 1957), *rev'd on other grounds*, *Gibson v. Thompson*, 355 U.S. 18 (1957). The "person of ordinary prudence" standard is a

---

[4] DFPS's regulations were amended after Ms. Mosley's administrative appeal of the HHSC's Final Order. The older versions of DFPS's regulations, as they existed at the time of the incident with AW, apply to this case. The applicable, relevant regulations from title 40, chapter 711 of the Texas Administrative Code are provided in the Appendix to this brief.

15

traditional reasonable-person standard based on the knowledge and skills of an *ordinary* person and only that superior knowledge or skill that the actor actually has. *Jackson v. Axelrad*, 221 S.W.3d 650, 655-56 (Tex. 2007). By incorporating negligence into the definition of neglect, the circumstances surrounding, and the reasonableness of, the employee's conduct are—on the very face of the regulation—integrated into the consideration of whether to impose the EMR's lifetime employment ban.

The DFPS's rule defining "neglect" cross-references the "[e]xamples of neglect" listed in 40 Administrative Code section 711.19(1)-(3). 40 Tex. Admin. Code § 711.1406(3) (2015). According to section 711.19, neglect includes, but is not limited to, the failure to:

> (1) establish or carry out an appropriate individual program plan or treatment plan for a person served, if such failure results in a specific incident or allegation involving a person served;
>
> (2) provide adequate nutrition, clothing, or health care to a specific person served in a residential or inpatient program; or
>
> (3) provide a safe environment for a specific person served, including the failure to maintain adequate numbers of appropriately trained staff, if such failure results in a specific incident or allegation involving a person served.

40 Tex. Admin. Code § 711.19 (2015). This DFPS definition expressly adopted, in substance, the federal definition under the Protection and Advocacy for Individuals

16

with Mental Illness Act ("PAIMI").[5] 20 Tex. Reg. 3830, 3831 (May 23, 1995) (adopting PAIMI definition at former 25 Tex. Admin. Code § 404.4, which aligns with current 40 Tex. Admin. Code §§ 711.19, 711.1406). The PAIMI definition of neglect was developed following an extensive investigation of large state institutions to address the congressional findings that "individuals with mental illness are subject to neglect, including lack of treatment, adequate nutrition, clothing, health care, and adequate discharge planning." 42 U.S.C. § 10801(a)(3). The focus of the federal legislation, like the Texas program, is not to penalize unsuspecting workers, but to protect the mentally disabled, given a history of egregious wrongs too easily hidden from view. *See* S. REP. NO. 99-109, at 4 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1361, 1364.

### III. Point of Error 1. The HHSC erred in finding that Ms. Mosley committed "neglect" because the record does not contain substantial evidence to support the finding of negligence, a required component of neglect.

The HHSC conclusion that Ms. Mosley committed neglect is based primarily on the alleged fact that Ms. Mosley failed to maintain one-to-one supervision within arm's-length distance of AW. AR 1:0035 (Final Order, COL 9). However, given the circumstances in which Ms. Mosley cared for AW on that day, it was impossible for Ms. Mosley to maintain one-to-one arm's-length

---

[5] This Act was formerly known as the Protection and Advocacy for Mentally Ill Individuals Act. *See* H.R. REP. NO. 99-576, at 15 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1377.

17

supervision. No reasonable mind could conclude otherwise. Because neglect requires "a negligent act or omission," 40 Tex. Admin. Code § 711.1406(a)(3) (2015), and negligence requires consideration of the circumstances, *Thompson* at 105, the impossibility of maintaining one-to-one arm's-length supervision means that Ms. Mosley's conduct did not constitute "neglect."

Additionally, the negligence test employs a traditional reasonable-person standard that focuses on the knowledge and skills of an ordinary person and only that superior knowledge that the actor actually has. *Jackson* at 655-56. AW's treatment plans uniformly indicate that AW would exhibit warning signs or symptoms before any attempt to harm herself. But AW did not exhibit warning signs prior to swallowing the batteries. Thus, leading up to the incident, Ms. Mosley reasonably did not know that AW might harm herself, and, without knowledge or reason to know of AW's increased likelihood of self-harm *at that time*, Ms. Mosley's momentary distraction from AW is not negligence.

**A. Ms. Mosley did not commit negligence because it was impossible to maintain one-to-one supervision within arm's-length distance, when staffed alone with AW for nearly seven hours.**

The HHSC Final Order acknowledges that Ms. Mosley was assigned a 14-hour shift ("from 8:00 a.m. to 10:00 p.m."), AR 1:0033 (Final Order, FOF 4), and that no other persons besides Ms. Mosley and AW were present in the home at the supposed time that AW swallowed two AA batteries. AR 1:0032. Further,

HHSC's administrative record contains uncontroverted evidence that Ms. Mosley was the only employee staffed by Doubletree to care for AW at the H** Home between 8:30 a.m. and approximately 3:15 p.m., a period of nearly seven hours. AR 1:0061, 0070.

It is unreasonable and defies common sense to imagine that an ordinary person is capable of maintaining arm's-length supervision of any other person for a period of nearly seven hours. For starters, what could an ordinary caretaker—like Ms. Mosley—do if she needed to use the restroom? It is apparent from the record that the HHSC Final Order holds Ms. Mosley to a superhuman standard that requires elimination of ordinary necessities such as restroom breaks.

Testimony at the HHSC hearing from one of Ms. Mosley's coworkers highlights the absurdity of requiring Ms. Mosley to care for AW without any help for so long. DFPS's attorney asked Ms. Mosley's coworker, Desiree Garcia, about what would happen if a caregiver needed a short break while the caregiver was assigned to a one-on-one client like AW:

> [DFPS's attorney:]   Can you call for someone to give you relief if you need someone to come to the house?
> [Coworker DG:]   You need the restroom or something.
> [DFPS's attorney:]   Yeah, so someone comes over? Is it close to your other locations or what? I get the sense people can just come right over.
> [Coworker DG:]   **No**, because in that -- H[** Home] is three clients. A.W.'s a one-to-one; the other girls, they're not. But there's a staff with them.

19

| | |
|---|---|
| [DFPS's attorney:] | But if I -- I guess I'm not making it clear. She's there by herself, the other staff are gone. If she needs to go to the bathroom or something, what does she do, Ms. Mosley, in that situation, or any caregiver? If you need to be spelled, if you need relief? -- I mean you've got a long shift; you must get a lunch break. |
| [Coworker DG:] | Right. |
| [DFPS's attorney:] | So someone comes over from the main office or something? What do they do? |
| [Coworker DG:] | **There should be a staff there.** |
| [DFPS's attorney:] | There should be a staff there. And if there's not, what do you do, you just call someone? Has it ever happened to you? |
| [Coworker DG:] | No, there's -- **I mean there's always going to be a staff with you there at times.** |
| [DFPS's attorney:] | Uh-huh. |
| [Coworker DG:] | Yeah. |
| [DFPS's attorney:] | Okay. **So that there might be short periods of time where you're alone, but not for very long**? |
| [Coworker DG:] | No. |
| [DFPS's attorney:] | **Okay. So you get enough time to go to the bathroom or whatever you want to do** -- |
| [Coworker DG:] | Right, right. |
| [DFPS's attorney:] | -- **and someone else watches the client while you** -- |
| [Coworker DG:] | Correct. |
| [DFPS's attorney:] | -- **take a break.** |
| [Coworker DG:] | **Correct.** |

AR 2:162(13-25)-163(1-15) (emphasis added).

This testimony illustrates that DFPS's counsel recognized the importance of the circumstances in which Ms. Mosley found herself caring for AW. Indeed, the legal standard—negligence—takes those circumstances into account. However, the HHSC Final Order strikingly ignores this obvious fact that caregivers need

20

backup support to provide one-on-one supervision for long periods of time. As Ms. Mosley's coworker, Ms. Garcia, stated, "There should be a staff there." AR 2:163(7). Yes, there *should be* staff there, but it is uncontroverted on this administrative record that *there was not staff there to assist Ms. Mosley*. Ms. Mosley was left alone with AW for almost seven hours. Under those circumstances, it was impossible for Ms. Mosley, at all times, to maintain one-to-one arm's-length supervision.

**B. Given the absence of symptoms or threats in the days and hours beforehand, AW's secretive conduct at the time of the incident was not foreseeable, and therefore Ms. Mosley's conduct did not constitute neglect.**

Even where a special relationship supports a duty to guard against another's behavior, "[i]t is well settled that even though injury may result from a person's act or omission, the actor is not to be held responsible if he could not have reasonably foreseen the resultant injury, or injuries similar in character." *Thompson*, 298 S.W.2d at 105; *see Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 39 (Tex. 2002) (finding material issues of fact on foreseeability, precluding summary judgment where intermediate care facility allowed consumer a home visit during which consumer committed a crime). While the general character of the injury, not the exact sequence of events that produced the harm, must be foreseeable, *El Chico*

21

*Corp. v. Poole*, 732 S.W.2d 306, 313 (Tex. 1987),[6] the "standard to test the question of negligence vel non is the common experience of mankind," and the relevant analysis is of the prudence expected "to prevent injury *under the circumstances of the particular case." Great Atl. & Pac. Tea Co. v. Evans*, 175 S.W.2d 249, 251 (Tex. 1943) (emphasis added). Texas courts recognize that "foreseeability is not determined by hindsight, but by what the defendant knew or should have known when the incident occurred." *Dyess v. Harris*, 321 S.W.3d 9, 15 (Tex. App.—Houston 2009, pet. denied) (citing *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 757 (Tex. 1998)).

In evaluating the foreseeability of the most extreme kind of self-harm, suicide, Texas courts look at immediately preceding circumstances and facts to determine whether a person of "ordinary intelligence" had notice and should have anticipated the risk and general consequences of his or her actions. *Perez v. Lopez*, 74 S.W.3d 60, 68-69 (Tex. App.—El Paso 2002, no pet.) (finding no evidence that a minor who had locksmiths remove a trigger lock said or did anything to put the locksmiths on notice of his suicidal intent). Similarly, "in determining whether criminal conduct was foreseeable" in premises-liability cases, the court examines the circumstances leading up to the act, looking at criminal conduct in light of five

---

[6] Because, under Texas law, "[t]he 'foreseeability' analysis is the same for both duty and proximate cause," this brief cites cases discussing foreseeability in the context of both duty and causation. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010) (quoting *Mellon Mortg. Co. v. Holder*, 5 S.W.3d 654, 659 (Tex. 1999)).

"factors—proximity, recency, frequency, similarity, and publicity." *Timberwalk Apartments*, 972 S.W.2d at 759; *see also Del Lago Partners*, 307 S.W.3d at 774. These factors are relevant to evaluating the foreseeability of the need to guard against another party's harmful actions in a particular circumstance—in this case, AW's actions.

### 1. Ms. Mosley's prudence was required to be that of an ordinary worker in a field requiring only basic skills and training.

Armed with neither specialized training nor sufficient experience, Ms. Mosley exercised "reasonable care" to provide AW with services. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000) ("[W]e have recognized that a duty to use reasonable care may arise when a person undertakes to provide services to another, either gratuitously or for compensation." (citing RESTATEMENT (SECOND) OF TORTS §§ 323, 324A (1965))). In all cases, "the traditional reasonable-person standard" must be interpreted "as one taking into account both the knowledge and skills of an ordinary person *and* 'such superior attention, perception, memory, knowledge, intelligence, and judgment *as the actor himself has*.'" *Jackson*, 221 S.W.3d at 656 (Tex. 2007) (quoting RESTATEMENT (SECOND) OF TORTS § 289 (1965)) (second emphasis added). For instance, even a physician held to a "physician-of-ordinary-prudence standard" is subject to "not a higher standard of care (like strict liability, or the high-degree-of-care standard for common carriers)

23

or a lower standard of care (like gross negligence, or the willful-and-wanton standard for emergency care). It is instead the ordinary-care standard, modified to instruct jurors that 'under the same or similar circumstances' means they must consider a physician's training." *Id.* at 655 (footnotes omitted).

HCS facility workers are not credentialed in any way and are generally low-paid members of the workforce. *See Home Care Assoc.*, 799 F.3d at 1094-95 (upholding Department of Labor rule extending minimum wage and overtime protections to home-care workers due to transformation of industry in connection with shift away from institutional care); Sen. Research Ctr., Bill Analysis, Tex. S.B. 967, 76th Leg., R.S. (1999). This class of workers does not consist of highly trained professionals, but rather hard-working employees with limited skills and training. The ordinary prudence standard, as applied to the facts of the particular circumstance, therefore governs HCS facility workers' conduct.

### 2. AW's Treatment Plans do not convey to the ordinary worker that AW would surreptitiously engage in self-harm without warning.

A reasonable HCS worker relies upon the information in the Behavior Support Plan, Person-Directed Plan, and Implementation Plan (collectively, the "Treatment Plans") for insight on a consumer's needs. AW's Treatment Plans established a pattern of anticipated symptoms and behaviors expected prior to self-harming behavior. Not only do the Treatment Plans fail to clearly indicate to the

24

reasonable, ordinary reader that self-harming behavior would occur without warning, the Behavior Support Plan says just the opposite.

AW's Behavior Support Plan clearly identifies and "monitors three target behaviors: self-harm, suicidal behavior, and aggression; and one symptom: hearing voices." AR 1:0125. The plan goes on to state that the consumer exhibits warning signs or symptoms before engaging in those behaviors, specifically: "[d]angerous behavior correlates with reports she is hearing voices and subsequent threats to harm herself." AR 1:0146. The "Baseline" behavior description focuses on AW "making threats to harm herself," "threatening staff," and "threatening to kill herself." AR 1:0145.

Further, AW's Person-Directed Plan dated December 2, 2013, indicates AW exhibits the "symptom" of "hearing voices." AR 1:0125 (Person-Directed Plan). AW's "Person-Directed Plan" also states AW was "doing a good job of being safe," and that AW "will turn to staff for comfort when she gets upset," not that she will withdraw. AR 1:0125. In addition, AW's Person-Directed Plan provides a field in which to "[i]dentify any needs, requests or considerations specific to this service that are necessary for the staff to know when supporting the individual in achieving his/her outcomes." AR 1:0124-0130. Absolutely no additional information—such the need to guard against surreptitious behavior—was noted in that field. AR 1:0124-0130. The Implementation Plan, specific to and labeled as a

25

page relevant to AW's participation in Day Habitation, indicates that during AW's participation in "an activity of choice," the one-to-one supervisor "will ensure that [AW] does not pick up any items that she can use to cause damage to herself." AR 1:0137. There is no similar text on her Implementation Plan for "Behavioral Support," AR 1:0134, the relevant plan for a worker, like Ms. Mosley, assigned specifically to provide services *in the home*.

The Treatment Plans thus do not convey that AW would engage in secretive, opportunistic self-harming behavior. *Cf. Timberwalk Apartments*, 972 S.W.2d at 758-59 (stating that unpublicized, unreported criminal activity on premises is not evidence of foreseeability). In fact, the Treatment Plans lead an ordinary person to believe that, before the correlating harmful behavior is likely to occur, AW will exhibit precursor behaviors—she will make threats, report symptoms, and reach out to staff for comfort. AW did not do so on February 14th prior to the incident, and the record contains no evidence that AW had done so in the days leading up to the incident.

> ### 3. Ms. Mosley's personal observations and experience at the H\*\* Home did not suggest AW would behave subtly, secretively, or without warning.

Even though AW had a Behavior Support Plan and "a bunch" of other plans, Ms. Mosley never received training on this consumer's "individual needs" prior to working with her one-to-one, alone, on February 14, 2014. AR 2:127(9),

2:126(25). Theresa Faller-Gerrenhaw, the Director and owner of Doubletree, conceded that Ms. Mosley had not received training on caring for AW specifically: "[T]he care plan probably would have been—probably with—[Ms. Mosley] should have had a nurse go out and train on individual needs and the meds and things like that . . . I'm not sure—she had been there not very long, and I'm not sure whether she had actually been trained by JK at this point." AR 2:126(23)-127(6). Ms. Mosley had never worked alone with this consumer one-to-one prior to the day of the incident. AR 2:30(1-11). And she certainly had never spent time with this consumer without the benefit of other caregivers in the house. AR 2:30(9). To the extent Ms. Mosley had worked one-to-one with any consumers, it had been with non-verbal and/or low-functioning and mobility-impaired individuals. AR 2:37(5-7), 2:232(8-11).

Ms. Mosley's limited direct experience nevertheless apprised her of some aspects of AW's behavior and general care. For example, in Ms. Mosley's experience, AW cursed when upset. AR 2:84(16-17). Ms. Mosley also observed that other H** Home workers allowed AW some privacy in the bathroom, permitting her to go in alone with the door cracked, as long as the worker could see AW's back. AR 2:160-61(22-16) (Garcia testimony). Ms. Mosley also knew that AW handled knives while cooking. AR 2:34(23)-35(6), 2:43(6-10). During the time Ms. Mosley worked at the H** Home, AW had not demonstrated any self-

27

harming or suicidal behaviors—demonstrating a lack of recency of AW's target behaviors. AR 2:83 (21-25), 2:157(21)-58(7). *Cf. Timberwalk Apartments*, 972 S.W.2d at 757–58 ("Foreseeability also depends on how recently and how often criminal activity has occurred in the past.").

Ms. Mosley's limited frame of reference stands in stark contrast to the experiential knowledge of others exhibited in the record. For example, Desiree Garcia testified that AW "sounded sad" or "[n]ot her normal self" immediately before the incident—an assertion Ms. Garcia did *not* share with Ms. Mosley on the phone that day. AR 2:153(14-19). But Ms. Garcia could tell so only, in her words, "[b]ecause I've worked with A.W. for a while." AR 2:157(3) (Garcia testimony). Similarly, Theresa Faller-Gerrenhaw knew that AW "will suck you in and try to be your friend, and when your guard is down, boom, that's when she does it." AR 2:137(15-16). And K.W. [name redacted], the Registered Nurse for Doubletree since 1994, knew "it would be easy to be lulled into false security or to have difficulty maintaining professional boundaries because [AW] is very high functioning." AR 1:0100.

Ms. Mosley knew none of this. Her minimal training and AW-specific experience left her without any "superior attention, perception, memory, knowledge, intelligence, and judgment" applicable to the incident with AW. *See Jackson*, 221 S.W.3d at 655-56. In fact, her experience told her that AW was to be

28

given at least some privacy and trust. Ms. Mosley is thus held only to the standard of care of a reasonably prudent person, equipped with the information in the Treatment Plans.

**4. Symptoms that correlate with AW's dangerous behaviors were wholly absent in the days and hours prior to the February 14, 2014, incident.**

Based on the record evidence, Ms. Mosley had neither notice nor reason to foresee that AW might act secretively to obtain implements of self-harm, without exhibiting symptoms. Certainly, this consumer received one-to-one supervision for target behaviors, including self-harm. However, because "the danger of injury is foreseeable" only when the "injury might reasonably have been contemplated as a result of the defendant's conduct," the court must ask whether "a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission." *Perez*, 74 S.W.3d at 68 (quotation marks and ellipses omitted). For instance, a Texas court held locksmiths who removed a rifle trigger lock upon a minor's request were not liable for the minor's subsequent suicide because "there [was] no evidence that [the minor] said or did anything to put [the locksmiths] on notice of his intent to commit suicide," and thus "evidence established that it was not foreseeable." *Id.* at 68. Similarly, in a Nebraska case, one patient's assault of another at a Nebraska Department of Health and Human Services ("DHHS") facility was found unforeseeable. *Ehlers v. State*, 756 N.W.2d 152, 156-57 (Neb.

29

2008). The court found no evidence from which to reasonably conclude that the Nebraska DHHS employee "saw or heard something which would have alerted him to the impending assault in time to prevent it." *Id.* at 157 (holding that actual identification of or affidavit from employee alleged to have witnessed agitated behavior by assailant before incident was required to impose liability).

Here, all record evidence shows AW's clandestine behavior was unforeseeable. While this consumer possessed a history of self-harm and suicidal ideations, on that day and in the days and hours leading up to the incident, the record shows that the consumer exhibited *none* of the behaviors that would have alerted Ms. Mosley to a reasonable likelihood of an imminent attempt in any available moment. According to AW's case manager, Josie Vargas, "[AW] will go several months without any incidents of suicidal ideations." AR 1:0053. Similarly, according to Desiree Garcia (who more regularly worked with AW), AW exhibited "no behaviors" in the weeks immediately beforehand—weighing against the notion that AW's self-harm incidents could be expected to occur frequently. AR 1:0053 (Investigative Report), 2:157(21)-158(7); *cf. Timberwalk Apartments,* 972 S.W.2d at 758 (stating that occurrence of only a few crimes "over an extended time period[] negates the foreseeability element").

On that day, and in all previous days documented in the record, the consumer exhibited no symptoms that *correlated* with her harmful behavior. *See*

30

AR 1:0145 (BSP). The record contains no evidence that AW reported hearing voices on the day of the incident or on any previous day in the record. *See* AR 1:0151-0156 (Service Delivery Logs). The record contains no evidence that AW threatened to harm herself on the day of the incident or on any previous day in the record. *See* AR 1:0151-0156 (Service Delivery Logs). Per the Behavior Support Plan, staff would have "provided daily documentation on all target behaviors" if they had been occurring. AR 1:0148. The record contains no evidence that AW sought comfort from Ms. Mosley or from Ms. Garcia on the phone or from any other worker who arrived in the afternoon, until she revealed her actions to the visiting nurse in the evening. AR 1:0060 (AW declined additional conversation with Ms. Garcia when offered).

Because AW had been mildly ill with a stomach bug and rash in the days leading up to February 14, 2014, AW's conditions were discussed with the nurses, AW visited with a nurse, and AW visited a doctor. AR 1:0152, 1:0154-0156. Nothing in the record indicates that any of these medical professionals documented any target or suspicious behaviors. Ms. Mosley's experience caring for other patients at the house had also demonstrated to her that "normally when AW get[s] mad, she start[s] cursing." AR 2:84(16-17). There is no record evidence that AW had been cursing prior to the incident. Nor was there any record evidence of AW crying. *See* AR 2:122(4-7) (describing historical pattern of "a lot of crying" when

31

depressed). Ms. Mosley had no indication AW was upset. AR 1:0061 ("She didn't seem upset at all.").

In short, based on the record evidence, nothing Ms. Mosley actually knew from her experience or could have known from AW's Treatment Plans suggested that this consumer would engage in her self-harm asymptomatically, without prior warning. The only way a caregiver could learn the consumer's surreptitious nature was through extended experience with the consumer or training on matters beyond AW's Treatment Plans. Ms. Mosley had neither.

Therefore, looking prospectively from the time immediately before the incident, a "person of ordinary intelligence," like Ms. Mosley, could not have foreseen that AW would attempt self-harm during the momentary period AW was out of arm's reach. Indeed, the facts here—a momentary distraction from arm's-length supervision of an asymptomatic consumer in a group home—stand in sharp contrast, for example, to a case in which a hospital was held liable for the suicide of a patient being treated for anxiety after a hospital employee provided the patient with a razor and left him unsupervised for three hours. *See Rio Grande Reg'l Hosp., Inc. v. Villarreal*, 329 S.W.3d 594, 615-16 (Tex. App.—Corpus Christi 2010, pet. granted, judgm't vacated w.r.m.). The evidence in *this* case, for *this* consumer, fails to support finding *this* injury on *this* day to be foreseeable. *See Del Lago*, 307 S.W.3d at 777 (finding bar owner liable for failing to guard against

32

barroom brawl that built for 90 minutes while servers continued to provide alcohol, noting that "on *this* record *this* sequence of conduct on *this* night in *this* bar [Defendant] could foretell *this* brawl"). Because agency decisions must be supported by substantial evidence in the record, the dearth of evidence on any advance indications of distress or symptoms and the absence of instructions in the Treatment Plans on surreptitious behavior in the home reveals the defect in the finding of foreseeability, *see* AR 1:0033 (Final Order, FOF 8), and therefore, the erroneous and arbitrary and capricious nature of Conclusions of Law 9, 10, and 11. *See* Tex. Gov't Code § 2001.174(D),(E),(F).

## IV. Point of Error 2. The HHSC erroneously applied a strict liability standard given lack of substantial evidence on duration out of arm's length.

### A. The record lacks substantial evidence regarding the actual duration that AW was out of arm's length, an essential underlying fact for foreseeability and the conclusion that neglect occurred.

The HHSC made no finding as to the amount of time AW was out of arm's-length supervision. *See* AR 1:0033-0034 (Final Order, FOF 1-16). The HHSC explained that the record evidence did not establish that Ms. Mosley left AW alone in the house but only that Ms. Mosley "did not maintain arm's length distance while [Ms. Mosley] was on the phone with Ms. Garcia." AR 1:0032 (Final Order, Analysis at p. 4). Accordingly, the finding of fact the HHSC made is that:

33

[Ms. Mosley] took the phone from AW and talked to Ms. Garcia for at least five or six minutes. While [Ms. Mosley] was on the phone, AW walked away.

AR 1:0033 (Final Order, FOF 5).

As the fact-finder, HHSC "is the sole judge of the weight to be accorded the testimony of each witness," *Lamb Cty. Elec. Co-op., Inc. v. Pub. Util. Comm'n of Tex.*, 269 S.W.3d 260, 272 (Tex. App.—Austin 2008, pet. denied), and HHSC determines the duration of the call, based on the testimony. While a reviewing court looks at substantial evidence "in view of the reliable and probative evidence in the record as a whole," it "is prohibited from substituting its judgment for that of the agency as to the weight of the evidence on questions committed to agency discretion." *Tex. Health Facilities Comm'n v. Charter Medical-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984); *see* Tex. Gov't Code § 2001.174.

The HHSC's finding on the duration of the call does not address the amount of time AW was left alone. The total absence of a finding on this essential underlying fact is due to the HHSC's decisions regarding the credibility of the evidence. The HHSC weighed testimony from numerous witnesses regarding AW's statements, *see* AR 2:182(18-20), 2:217(22)-220(10), reviewed AW's unsworn statements, *see* AR 1:0051-0052, 1:0059, and also weighed Ms. Mosley's sworn testimony. *See, e.g.*, AR 2:23. Without credible evidence to determine how long AW was left alone, however, the HHSC could not determine whether Ms.

34

Mosley acted reasonably, in light of her limited experience with AW, and whether she could have foreseen, based on the information available to her, that AW would have acted as she did. Because the record lacks credible evidence, after weighing testimonial evidence, the HHSC was unable to make a finding as to the duration AW was out of arm's length. *See Cont'l Imports, Ltd. v. Brunke*, 03-10-00719-CV, 2011 WL 6938489, at *5 (Tex. App.—Austin Dec. 30, 2011, pet. denied) (noting "a reviewing court may not sustain the agency's decision on a *factual* basis not addressed by the agency" (emphasis in original)).

**B. The HHSC thus failed to apply its own "negligence" standard, erroneously holding Ms. Mosley to a strict liability standard.**

Absent a finding on the time AW spent out of arm's length, the HHSC effectively adopted a strict liability standard under which *any* lapse in one-to-one supervision constitutes "neglect," regardless of the reasonableness of the worker's acts or omissions or the foreseeability of the harm under the particular facts and circumstances. *See* AR 1:0033-0035 (Final Order, FOF 8 ("Petitioner's failure to remain within arm's length distance of AW placed AW at a foreseeable risk of physical injury."); COL 9 ("Because a preponderance of the evidence showed that on February 14, 2014, Petitioner failed to maintain one-to-one supervision within arm's length distance of AW—as required by AW's treatment plan—thus enabling AW to remove and swallow batteries, placing her at risk of physical injury such as bowel obstruction or perforation, Petitioner committed neglect.")). Thus, the

35

HHSC equated the momentary distraction from arm's-length supervision to neglect, based on a discrete divergence from the treatment plan—not based on a review of the reasonableness of Ms. Mosley's actions against the actual surrounding facts and circumstances.

HHSC uses hindsight to assert that, because the incident occurred, whatever time AW spent out of arm's length must have been sufficient for the incident to be foreseeable. But Texas courts recognize that "foreseeability is not determined by hindsight, but by what the defendant knew or should have known when the incident occurred." *Dyess*, 321 S.W.3d at 15; *see also* 53 Tex. Jur. 3d *Negligence* § 23 (2014) (stating "the injury must have been foreseeable by the wrongdoer at the instant of the wrong").

Upholding the HHSC's Final Order would require this Court to transform the Texas "neglect" standard from one of negligence to one of strict liability. While an agency receives deference in interpreting its rules, "if the [agency] has failed to follow the clear, unambiguous language of its own regulation, [the court] must reverse its action as arbitrary and capricious." *Pub. Util. Comm'n of Tex. v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991). The plain, unambiguous language of the regulations incorporates *negligence*, and therefore HHSC misapplied its own regulations and acted arbitrarily and capriciously by applying strict liability. *See* Tex. Gov't Code § 2001.174(2)(D), (F).

To find reportable conduct—to ban Ms. Mosley from her livelihood working in DADS-regulated facilities—the HHSC must evaluate whether, to an ordinary worker, there was a foreseeable risk in the duration of time AW was out of arm's-length supervision, under the actual facts and circumstances leading up to the incident. HHSC lacked sufficient evidence to make a finding on AW's time out of arm's reach. Accordingly, without this essential, underlying fact, the finding of foreseeability is not supported by substantial evidence. *See* AR 1:0033 (FOF 8). Absent foreseeability, there is no negligence, no neglect, and therefore no reportable conduct. Conclusions of Law 9, 10, and 11 are in error and arbitrary and capricious. *See* Tex. Gov't Code § 2001.174(2)(D)-(F).

## V.    Point of Error 3.  The HHSC erred in finding Ms. Mosley caused or may have caused harm.

The HHSC erred in concluding that Ms. Mosley "caused or may have caused AW risk of harm," a required element of "reportable conduct." Tex. Hum. Res. Code § 48.401. Causation is also a necessary element of any finding of negligence and therefore neglect. *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006) ("To establish negligence, a party must establish . . . damages proximately caused by the breach."). Proximate cause requires both foreseeability and that the conduct be a cause in fact of the injury. *McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 903 (Tex. 1980).

37

As laid out in detail above, the record lacks substantial evidence and key findings to support the foreseeability of AW's asymptomatic and surreptitious behavior under the particular facts and circumstances of this case. Therefore Ms. Mosley's momentary distraction from arm's-length supervision was not the proximate cause of the harm to AW.

Ms. Mosley faced an unforeseeable risk because Doubletree staffed her on a double shift without completing her training and without providing adequate warning about the consumer's behavior, in the Treatments Plans or otherwise. *See* AR 2:126(23)-127(6), AR 1:0121-0149, 0169. The HHSC did not acknowledge that, if Ms. Mosley was to be charged with "carrying out a treatment plan," the plan should have been "appropriate," as specified under the Administrative Code. *See* 40 Tex. Admin. Code §§ 711.19(1) (2015), 711.1406 (2015). Conclusion of Law 7 states that "neglect includes the failure to (1) carry out an individual program or treatment plan." AR 1:0034. The Administrative Code, on the other hand, provides that negligence includes failure to "establish or carry out an *appropriate* individual program or treatment plan for the person served." 40 Tex. Admin. Code. § 711.19(1) (2015) (emphasis added). The Final Order contains no finding that the Treatment Plans were appropriate in light of AW's history, and whether they were is questionable. For example, the Treatment Plans do not limit access to remote controls or specify that batteries or other small objects must be

38

secured in the house in any way, even though Doubletree knew AW's history of swallowing small objects, including batteries. *See* AR 1:0121-0149.

Proximate cause also requires that Ms. Mosley's conduct be the cause in fact, meaning a substantial factor in bringing about the injury, *without which the injury would not have occurred*. *McClure*, 608 S.W.2d at 903. The HHSC failed to make any findings regarding whether AW could have secured or swallowed the batteries while in arm's length, under the conditions at the H\*\* Home. AR 1:0033-0034 (Final Order, FOF 1-16). These are key facts to determining whether Ms. Mosley's conduct necessarily contributed to AW's harm. No Treatment Plan states that AW cannot turn her back to her supervising worker. *See* AR 1:0121-0149. No record evidence suggests that Doubletree in any way limited or secured remote controls, batteries, or other small objects in the house. AR 2:68(22-25) (Mosley testimony). In one unsworn statement, AW stated that she swallowed the batteries with water in the kitchen. AR 1:0059. Ms. Mosley recounted that AW had a glass of water in the kitchen, while in arm's reach, shortly after the distracting phone call. AR 2:94(9-20) (Mosley testimony). Yet, the HHSC, having reviewed and weighed the evidence, made no analysis of or factual findings on these critical details. AR 1:0031-0033 (Final Order, Analysis).

39

Accordingly, the record lacks substantial evidence that Ms. Mosley was the cause in fact or proximate cause of harm to AW. Finding of Fact 8 is unsupported, and Conclusions of Law 9, 10, and 11 are in error and arbitrary and capricious.

## CONCLUSION AND PRAYER

Ms. Mosley was very concerned for AW and felt personally, emotionally affected by this incident. AR 2:57(10-13), 2:236(21-22). But the consequences extend even further if this Court upholds the HHSC's flawed Final Order—Ms. Mosley's livelihood as a direct-care worker will be forever lost.

Ms. Mosley respectfully requests that this Court find the HHSC acted without substantial evidence, in error of law, and arbitrarily and capriciously and reverse the HHSC's Final Order. Ms. Mosley prays for such further relief to which she may be justly entitled.

Respectfully submitted,

BAKER BOTTS L.L.P.

  /s/ Kevin E. Vickers
Kevin E. Vickers
State Bar No. 24079517
kevin.vickers@bakerbotts.com
Paulina Williams
State Bar No. 24066295
paulina.williams@bakerbotts.com
Samia R. Broadaway
State Bar No. 24088322
samia.broadaway@bakerbotts.com
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701-4078
512.322.2500 (phone)
512.322.2501 (fax)

ATTORNEYS FOR
PATRICIA MOSLEY

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document contains 9,404 words in the portions of the document that are subject to the word limits of Texas Rule of Appellate Procedure 9.4(i), as measured by the undersigned's word-processing software.

/s/ Kevin E. Vickers
Kevin E. Vickers

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on September 28, 2016, on the following:

Andrew Lutostanski
State Bar No. 24072217
andrew.lutostanski@texasattorneygeneral.gov
Assistant Attorney General
Office of the Attorney General of Texas
Administrative Law Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
512.475.4200 (phone)
512.320.0167 (fax)

/s/ Kevin E. Vickers
Kevin E. Vickers

**INDEX TO APPENDIX**

Tab A        Trial Court's Final Order (CR 260)

Tab B        HHSC Final Decision and Order (AR 1:27-36)

Tab C        Tex. Gov't Code § 2001.174

Tab D        Tex. Hum. Res. Code § 48.251

Tab E        Tex. Hum. Res. Code § 48.401

Tab F        Tex. Hum. Res. Code § 48.402

Tab G        Tex. Hum. Res. Code § 48.406

Tab H        40 Tex. Admin. Code § 711.19 (2015)

Tab I        40 Tex. Admin. Code § 711.1402 (2015)

Tab J        40 Tex. Admin. Code § 711.1406 (2015)



Tab A

CAUSE NO. D-1-GN-15-001024

| | | |
|---|---|---|
| PATRICIA MOSELY, | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| TEXAS HEALTH AND HUMAN | § | |
| SERVICES COMMISSION and | § | TRAVIS COUNTY, TEXAS |
| TEXAS DEPARTMENT OF FAMILY | § | |
| AND PROTECTIVE SERVICES, | § | |
| Defendants. | § | 201st JUDICIAL DISTRICT |

## ORDER DENYING DEFENDANTS' PLEA TO THE JURISDICTION
## AND AFFIRMING HHSC'S FINAL ORDER

Came on for consideration (1) a merits hearing on Plaintiff's appeal of the Texas Health and Human Services Commission's (HHSC) Final Order dated February 12, 2015 in cause No. 14-0474-M and EMR No. 039-14 and (2) the Plea to the Jurisdiction of Defendants, the Texas Health and Human Services Commission and the Texas Department of Family and Protective Services. The Court finds that all parties appeared at the May 20, 2016 hearing through counsel and announced ready. After considering the same and the relevant pleadings and briefing on file herein, the Court is of the opinion that Defendants' Plea to the Jurisdiction should be DENIED. Further, the Court finds that that substantial evidence exists in support of the HHSC Administrative Law Judge's final order and that the final order should be AFFIRMED.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Defendants' Plea to the Jurisdiction is DENIED.

THE COURT FURTHER FINDS that substantial evidence exists in support of the HHSC Final Order dated February 12, 2015 in cause No. 14-0474-M and EMR No. 039-14 and IT IS ORDERED, ADJUDGED AND DECREED that the HHSC Final Order is in all things AFFIRMED.

SIGNED on the __23__ day of May, 2016.

_____
DARLENE BYRNE
PRESIDING JUDGE





Tab B



# TEXAS HEALTH AND HUMAN SERVICES COMMISSION

KYLE L. JANEK, M.D.
EXECUTIVE COMMISSIONER

February 12, 2015

P        ι Mι

Austin, Texas ˊ

**CERTIFIED MAIL – 7011 1150 0000 5775 2354
RETURN RECEIPT REQUESTED AND BY
U.S. REGULAR MAIL**

**RE: P        Mι     vs. Texas Department of Family and Protective Services,
Cause No. 14-0474-M [DFPS # EMR 039-14]**

Dear Ms. M

Enclosed is the Final Decision and Order (Hearing Order) in the hearing you requested in the above-referenced matter. This Hearing Order will become final and your name will be submitted to the Employee Misconduct Registry unless you file a timely petition for judicial review.

Should you wish to appeal the Hearing Order, section 711.431 of the Texas Administrative Code provides, in pertinent part, as follows:

> (a) To request judicial review of a Hearing Order, the employee [you] must file a petition for judicial review in a Travis County district court, as provided by Government Code, Chapter 2001, Subchapter G.
>
> (b) The petition must be filed with the court no later than the 30th day after the date the Hearing Order becomes final, which is the date that the Hearing Order is received by the employee.
>
> (c) Judicial review by the court is under the substantial evidence rule, as provided by § 48.406, Human Resources Code.
>
> (d) Unless citation for a petition for judicial review is served on DFPS within 45 days after the date on which the Hearing Order is mailed to the employee, DFPS will submit the employee's name for inclusion in the Employee Misconduct Registry. If valid service

of citation is received after the employee's name has been recorded in the registry, DFPS will determine whether the lawsuit was timely filed and, if so, immediately request that the employee's name be removed from the registry pending the outcome of the judicial review.

40 TEX. ADMIN. CODE § 711.1431.

If you choose to file suit, as provided above, service of process should be made on John J. Specia, Jr., Commissioner of the Texas Department of Family and Protective Services, 701 W. 51st Street, Austin, Texas 78751.

Sincerely,

Sheela Rai
Administrative Law Judge
Appeals Division
Texas Health and Human Services Commission

cc: John Scott Howard
Department of Family and Protective Srvs.
P.O. Box 149030, MC: Y-956
Austin, TX 78714-9030

| | |
|---|---|
| P.   M    ,       § | |
| PETITIONER       § | |
|       § | |
| VS.       § | CAUSE NO. 14-0474-M |
|       § | EMR NO. 039-14 |
| TEXAS DEPARTMENT OF FAMILY       § | |
| AND PROTECTIVE SERVICES,       § | |
| RESPONDENT       § | |

## FINAL DECISION AND ORDER

### I. INTRODUCTION

On April 29, 2014, the Texas Department of Family and Protective Services (DFPS) notified P: M: ' (Petitioner) of its determination that Petitioner had committed acts that were reportable conduct as defined in title 40, chapter 711 of the Texas Administrative Code. DFPS also notified Petitioner that her name would become part of the Employee Misconduct Registry (EMR) maintained by the Texas Department of Aging and Disability Services (DADS) unless Petitioner appealed the determination. Petitioner submitted a request for hearing, which DFPS received on May 7, 2014. Based on the evidence admitted at the hearing, this Administrative Law Judge (ALJ) recommends that the determination be sustained.

### II. JURISDICTION, NOTICE, AND PROCEDURAL HISTORY

There are no contested issues of notice, jurisdiction, or venue in this proceeding. Therefore, those matters are set forth in the Findings of Fact and Conclusions of Law without further discussion here. On September 16, 2014, ALJ Sheela Rai, Appeals Division, Texas Health and Human Services Commission, convened a live hearing in Austin, Texas. Petitioner appeared *pro se*. John A. Howard, EMR Attorney, represented DFPS.

### III. APPLICABLE LAW

Pursuant to chapter 48, subchapter I of the Texas Human Resources Code, if an employee of a home and community-based services (HCS) provider commits reportable conduct, as further defined by DFPS rules, DFPS is required to place that person's name on the EMR maintained by DADS.

The relevant DFPS rules are generally codified at title 40, chapter 711 of the Texas Administrative Code. Section 711.1402 defines "reportable conduct" as "abuse, neglect or

exploitation that meets the definition of § **48.401(5)**, Human Resources Code, **and as further defined in § 711.1408**." 40 TEX. ADMIN. CODE § 711.1402(16) (Department of Family and Protective Services, Investigations in DADS and DSHS Facilities and Related Programs; Employee Misconduct Registry) (emphasis added).

"**Reportable conduct,**" as defined by section 711.1408 of the Texas Administrative Code, includes, "abuse or **neglect** that **causes or may cause** death or **harm** to an individual receiving agency services." *Id.* §711.1408(a)(1) (emphasis added); *see also* TEX. HUM RES. CODE § 48.401(5)(A) (similarly defining "reportable conduct"). Section 1408 further provides that for the purposes of this definition, the term "neglect" has the meaning provided in section 711.1406 relating to facility investigations, which include HCS investigations. 40 TEX. ADMIN. CODE §711.1408(b); *see also id.* §§ 711.1402(10) (defining "Facility investigation" to include employee of HCS provider agency), 711.1402 (12) (defining "HCS"), 711.1406 ("How are the terms abuse, neglect, and financial exploitation defined for Facility investigations?").

"**Neglect**" is defined in section 711.1406 as "a negligent act or omission by any individual responsible for providing services to a person served, which caused or may have caused physical or emotional injury or death to a person served or which placed a person served at risk of physical or emotional injury or death." *Id.* § 711.1406(a)(3). Section 1406 also states that "[e]xamples of neglect are listed in §711.19(1) - (3) of this title (relating to How is neglect defined?)." *Id.* Section 711.19, in turn, defines "neglect" as set out above and provides that:

> Neglect includes, but is not limited to, the failure to:
>
> (1) establish or carry out an appropriate individual program plan or treatment plan for a person served, if such failure results in a specific incident or allegation involving a person served;
>
> (2) provide adequate nutrition, clothing, or health care to a specific person served in a residential or inpatient program; or
>
> (3) provide a safe environment for a specific person served, including the failure to maintain adequate numbers of appropriately trained staff, if such failure results in a specific incident or allegation involving a person served.

*Id.* § 711.19. A "person served" is, in general terms, an individual with a disability receiving services in certain locations or by certain entities, including an HCS provider. *See id.* § 711.3(33).

"**Harm**," as defined in section 1408, is:

> (1) a significant injury or risk of significant injury, including a fracture, dislocation of any joint, internal injury, a contusion larger than 2 and ½ inches, concussion, second or third degree burn or any laceration requiring sutures;
>
> (2) An adverse health effect that results or is at risk of resulting from failure to receive medications in the amounts or at the times prescribed; or

2

(3) Any other harm or risk of harm that warranted or would reasonably be expected to have warranted, medical treatment or hospitalization.

*Id.* § 1408(c).

## IV. ANALYSIS

The issue in this case is whether Petitioner committed neglect, and if so, whether it constituted reportable conduct. Neglect requires a negligent act or omission by an individual responsible for providing services to a person served, which caused or may have caused physical injury to the person served or placed a person served at risk of physical injury. Neglect, as relevant here, includes the failure to (1) carry out an individual program or treatment plan for a person served; or (2) provide a safe environment for the person served, if it results in an incident. To constitute reportable conduct, the neglect must be such as to cause, or that may have caused, (1) a significant injury or risk of significant injury; or (2) any other harm, or risk of harm, warranting, or reasonably expected to warrant, medical treatment.

On February 14, 2014, Petitioner was employed by Doubletree Residential Services (Doubletree), an HCS provider, to provide direct care at Doubletree's group home located on H_____ Drive (H_____). AW was a 46-year old female living at the H_____ home, whose diagnoses included schizoaffective disorder, depression, diabetes, seizures, and mild intellectual disability. AW had a history of multiple suicide attempts, cutting herself, and swallowing batteries and other dangerous objects. To prevent such self-harming behaviors, AW's services and behavior support plans (collectively, treatment plan) required one-to-one supervision with staff within arm's length distance of AW while she was awake and line-of-sight supervision when AW was asleep.

The following facts or events are undisputed. On February 14, 2014, Petitioner signed on to provide one-to-one supervision of AW, which meant that Petitioner was required to keep AW in sight and remain within arms-length of AW at all times. That day, AW did not attend day habitation because she had had a rash and vomited earlier in the week. AW spent most of the morning and early afternoon sleeping in her room. Between 2:00 p.m. and 3:00 p.m., D G_____, another direct care staff at the H_____ home who was off that day, called on the house wireless telephone located in the living room. AW answered the phone. Petitioner asked AW about the identity of the caller and then took the phone from AW and talked to Ms. G On or about 7:00 p.m., AW told E_ O_____, a Doubletree licensed vocational nurse—who had come to the home to check on AW because of the earlier rash and vomiting—that AW had swallowed batteries, which she had removed from a television remote control device. AW was taken by two Doubletree employees to the Emergency Room at South Austin Medical Center. Dr. Steven Jennings admitted and assessed AW. Dr. Daniel S. Emmett, performed an emergent endoscopy and removed two AA batteries from AW's stomach. According to Dr. Jennings, the primary risk of swallowing batteries was bowel obstruction, which if left untreated could cause a perforation. Thus, while Petitioner was assigned to one-to-one supervision within arm's-length distance of AW, AW swallowed two batteries, placing her at risk of physical injury.

3

The issue here is whether the incident was the result of Petitioner's neglect, namely, Petitioner's failure to adequately supervise AW and provide a safe environment for her as required by the treatment plan. No other persons besides Petitioner and AW were present in the H home at the time of the incident. According to AW's statements during the DFPS investigation, when she woke up about 2:00 p.m., Petitioner was not in the room. When AW walked into the living room, Petitioner was talking on her personal cell phone and walked outside when she saw AW. Thus, when the house phone rang, AW answered it and talked to the caller, Ms. G AW became upset when Petitioner took the phone from AW. AW went to the bathroom. Next, AW went to her roommate K D. room, grabbed the remote, took out the batteries, threw the remote underneath the nightstand, went to the kitchen and swallowed the batteries with a glass of water. AW stated that she swallowed the batteries between 2:15 p.m. and 2:45 p.m.; and Petitioner was in the garage during this time period talking on her personal cell phone.

Petitioner denied that she failed to adequately supervise AW or left her alone in the house. According to Petitioner, the only time AW was not within sight or within arm's length distance was when Petitioner was on the phone with Ms. G. on or about 2:00 p.m. Petitioner explained that when she hung up the phone, AW was gone. Petitioner went towards the bathroom because that is where AW had said earlier that she was going. Petitioner saw, through the cracked-open bathroom door, AW getting ready to sit on the toilet and not doing anything else. Petitioner appeared to contend that Petitioner's actions did not breach the one-to-one supervision because, under AW's revised treatment plan, AW could go into the bathroom alone and simply leave the door cracked open.

It is generally undisputed that while Petitioner was assigned to one-to-one supervision within arms-length distance of AW, AW was able to remove and ingest two batteries without being seen. This could not have happened if Petitioner had maintained one-to-one supervision within arm's length distance of AW. It is unclear whether Petitioner left AW alone in the house. However, based on Petitioner's own testimony and statements, it is clear that Petitioner did not maintain arm's length distance while Petitioner was on the phone with Ms. G. According to Ms. G. statement and testimony, Petitioner was on the phone with Ms. G. for at least five to six minutes. Both Ms. G and T F G , a Doubletree director and owner, testified that when assigned to one-to-one supervision, staff members should not answer the house phone; if they do answer the phone, they should carry the phone with them; or tell the caller that they cannot talk then. Petitioner was the only staff present in the H home on February 14, 2014, so not answering the house phone may not have been a reasonable option. She could, however, have taken the phone and stayed with AW or told Ms. G. hat Petitioner could not talk or Petitioner would call Ms. G back. (Ms. G had called merely to inquire whether payroll checks for the staff had arrived; it was not an urgent matter.) Instead, Petitioner stayed on the phone and allowed AW to walk away, presumably to the bathroom. Based on her own statements and testimony, Petitioner knew that one-to-one supervision meant staying within arm's reach of AW; and AW required such supervision to keep her safe and ensure that she did not harm herself. Specifically, Petitioner knew that AW had previously swallowed batteries and stuck a pin in her belly button. Thus, Petitioner knew or should have known that failure to stay within arms-length distance of AW could result in such an incident. And contrary to Petitioner's attempt to justify her failure to stay within arm's length of AW, the record clearly established that AW's treatment plan was not revised to provide an exception from the arm's length distance supervision to permit AW more privacy when using the bathroom.

4

In sum, a preponderance of the evidence showed that Petitioner failed to maintain one-to-one supervision within arms-length distance of AW while Petitioner was on the telephone, thus enabling AW to remove and swallow batteries and placing her at risk of physical injury such as bowel obstruction or perforation. Accordingly, because Petitioner failed to carry out AW's treatment plan and failed to provide her a safe environment resulting in an incident involving AW, Petitioner committed neglect. Additionally, a preponderance of evidence showed that Petitioner's neglect constituted reportable conduct because such neglect caused or may have caused AW risk of harm, such as bowel obstruction or perforation, warranting a medical procedure to remove the ingested batteries to avoid such risk.

## V. FINDINGS OF FACT

1. On February 14, 2014, Petitioner was employed by Doubletree Residential Services (Doubletree), an HCS provider, to provide direct care at Doubletree's group home located on H_____ Drive (H_____

2. On February 14, 2014, AW was a 46-year old female living at the H_____ home, whose diagnoses included schizoaffective disorder, depression, diabetes, seizures, and mild intellectual disability. AW had a history of multiple suicide attempts, cutting herself, and swallowing batteries and other dangerous objects.

3. To prevent AW from harming herself, AW's individual services and behavioral support plans (collectively, treatment plan) required one-to-one level of supervision with staff within arm's length distance while AW was awake, and in line-of sight supervision when asleep.

4. On February 14, 2014, Petitioner signed on to provide one-to-one supervision within arm's length distance of AW from 8:00 a.m. to 10:00 p.m.

5. Between 2:00 p.m. and 3:00 p.m., another H_____ staff member, D___ G_____ called in on the house wireless telephone located in the living room and AW answered the call. Petitioner took the phone from AW and talked to Ms. G_____ for at least five or six minutes. While Petitioner was on the phone, AW walked away. Petitioner did not know where AW had gone.

6. On February 14, 2014, while on the phone with Ms. G_____, Petitioner did not remain within arm's length distance of AW as required by AW's treatment plan.

7. Petitioner knew that one-to-one supervision meant staying within arm's reach of AW; AW required such supervision to keep her safe and ensure that she did not harm herself; and AW had previously swallowed batteries and stuck a pin in her belly button.

8. Petitioner's failure to remain within arm's length distance of AW placed AW at a foreseeable risk of physical injury.

9. Between 2:00 p.m. and 3:00 p.m., AW removed batteries from another resident's television remote control device and swallowed them.

10. AW was taken to the Emergency Room at South Austin Medical Center. Dr. Steven Jennings admitted and assessed AW. Dr. Daniel S. Emmett performed an emergent endoscopy and removed two AA batteries from AW's stomach.

5

11. The primary risk to AW from the ingested batteries was bowel obstruction, which if left untreated could cause a perforation.

12. On October 14, 2014, DFPS was notified of possible neglect involving Petitioner.

13. Following an investigation of the alleged negligence, DFPS notified Petitioner on April 29, 2014, of its determination that Petitioner had committed neglect that rose to the level of reportable conduct. DFPS also notified Petitioner that her name would be placed on the EMR maintained by DADS unless she appealed the determination and it was modified; and of her right to appeal the determination.

14. On May 7, 2014, DFPS received Petitioner's request for appeal hearing.

15. On August 7, 2014, ALJ Sheela Rai issued an order to the parties that, among other things, provided the date, time, and location for the hearing.

16. All parties appeared at the hearing in this matter on September 16, 2014, when the record was closed following receipt of evidence on that date.

## VI. CONCLUSIONS OF LAW

1. DFPS has jurisdiction over this matter pursuant to Texas Human Resources Code section 48.405(a).

2. The ALJ has jurisdiction over matters related to the hearing in this proceeding, including the authority to issue a decision with findings of fact and conclusions of law, pursuant to section 48.405 of the Texas Human Resources Code and section 711.1421(a) and (b) of the Texas Administrative Code.

3. DFPS and the ALJ issued proper and timely notices. *See* TEX. HUM. RES. CODE §§ 48.404(a), 48.405(a); 40 TEX. ADMIN. CODE §§ 711.1413, 711.1414(a), 711.1421(a), (b).

4. Petitioner timely requested an appeal hearing. *See* TEX. HUM. RES. CODE § 48.404(b); 40 TEX. ADMIN. CODE § 711.1417(a).

5. DFPS has the burden of proof, by a preponderance of evidence, of showing that Petitioner committed an act of reportable conduct, as defined in section 48.401(5) of the Texas Human Resources Code and section 711.1408(a) of the Texas Administrative Code.

6. To constitute reportable conduct, DFPS must prove by a preponderance of evidence that Petitioner (1) committed neglect; and (2) such neglect caused or may have caused a significant injury or risk of significant injury, or other harm warranting, or reasonably expected to warrant, medical treatment. *See* TEX. HUM. RES. CODE § 48.401(5)(A); 40 TEX. ADMIN. CODE § 711.1408(a)(1), (c)(1), (3).

7. Neglect is a negligent act or omission by an individual responsible for providing services to a person served, which caused or may have caused physical injury to the person served or placed such person at risk of physical injury. 40 TEX. ADMIN. CODE § 711.1406(a)(3), 711.1408(b). Neglect includes the failure to (1) carry out an individual program or treatment plan for a person served; or (2) provide a safe environment for the person served, if such failure results in an incident involving the person served. *See id.* §§ 711.1406(a)(3), 711.19(1), (3).

6

8. Because Petitioner was employed by Doubletree, an HSC provider, to provide direct care services to residents at Doubletree's H     home, Petitioner was an HSC provider employee responsible for providing services to AW, a disabled person receiving services at the H    home.

9. Because a preponderance of evidence showed that on February 14, 2014, Petitioner failed to maintain one-to-one supervision within arms-length distance of AW—as required by AW's treatment plan—thus enabling AW to remove and swallow batteries, placing her at risk of physical injury such as bowel obstruction or perforation, Petitioner committed neglect.

10. Because a preponderance of evidence showed that Petitioner's neglect caused or may have caused AW risk of harm, such as bowel obstruction or perforation from ingested batteries, warranting medical treatment to remove the batteries to avoid the risk, such neglect constituted reportable conduct as defined in Texas Human Resources Code section 48.401(5) and Texas Administrative Code section 711.1408(a).

11. Petitioner's name should be reported to DADS for inclusion in the EMR, in accordance with Texas Human Resources Code sections 48.403 and 48.408 and Texas Administrative Code section 711.1411.

0035

## ORDER

**IT IS THEREFORE ORDERED** that the determination of the Department of Family and Protective Services (DFPS) that Petitioner committed neglect that constituted reportable conduct **BE SUSTAINED**.

Unless notice of petition for judicial review is served on DFPS within 45 days after the date on which this decision is mailed to Petitioner, DFPS **IS HEREBY ORDERED** to submit Petitioner's name and other identifying information, as described in section 48.408 of the Texas Human Resources Code, to the Department of Aging and Disability Services for inclusion in the Employee Misconduct Registry.

Signed this _12th_ day of _February_, 2014.

Sheela Rai
Administrative Law Judge
Appeals Division
Texas Health and Human Services Commission

8

Tab C

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 10. General Government (Refs & Annos)
      Subtitle A. Administrative Procedure and Practice
        Chapter 2001. Administrative Procedure (Refs & Annos)
          Subchapter G. Contested Cases: Judicial Review

V.T.C.A., Government Code § 2001.174

§ 2001.174. Review Under Substantial Evidence Rule or Undefined Scope of Review

Currentness

If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:

(1) may affirm the agency decision in whole or in part; and

(2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(A) in violation of a constitutional or statutory provision;

(B) in excess of the agency's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

**Credits**

Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993.

V. T. C. A., Government Code § 2001.174, TX GOVT § 2001.174
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

Tab D

Vernon's Texas Statutes and Codes Annotated
  Human Resources Code (Refs & Annos)
    Title 2. Human Services and Protective Services in General
      Subtitle D. Department of Family and Protective Services; Child Welfare and
      Protective Services
        Chapter 48. Investigations and Protective Services for Elderly Persons and
        Persons with Disabilities (Refs & Annos)
          Subchapter F. Investigations of Abuse, Neglect, or Exploitation of
          Individuals Receiving Services from Certain Providers

V.T.C.A., Human Resources Code § 48.251

§ 48.251. Definitions

Effective: September 1, 2015
Currentness

(a) In this subchapter:

(1) "Behavioral health services" means:

(A) mental health services, as defined by Section 531.002, Health and Safety Code; and

(B) interventions provided to treat chemical dependency, as defined by Section 461A.002, Health and Safety Code.

(2) "Community center" has the meaning assigned by Section 531.002, Health and Safety Code.

(3) "Facility" means:

(A) a facility listed in Section 532.001(b) or 532A.001(b), Health and Safety Code, including community services operated by the Department of State Health Services or Department of Aging and Disability Services, as described by those sections, or a person

contracting with a health and human services agency to provide inpatient mental health services; and

(B) a facility licensed under Chapter 252, Health and Safety Code.

(4) "Health and human services agency" has the meaning assigned by Section 531.001, Government Code.

(5) "Home and community-based services" means services provided in the home or community in accordance with 42 U.S.C. Section 1315, 42 U.S.C. Section 1315a, 42 U.S.C. Section 1396a, or 42 U.S.C. Section 1396n, and as otherwise provided by department rule.

(6) "Local intellectual and developmental disability authority" has the meaning assigned by Section 531.002, Health and Safety Code.

(7) "Local mental health authority" has the meaning assigned by Section 531.002, Health and Safety Code.

(8) "Managed care organization" has the meaning assigned by Section 533.001, Government Code.

(9) "Provider" means:

(A) a facility;

(B) a community center, local mental health authority, and local intellectual and developmental disability authority;

(C) a person who contracts with a health and human services agency or managed care organization to provide home and community-based services;

(D) a person who contracts with a Medicaid managed care organization to provide behavioral health services;

(E) a managed care organization;

(F) an officer, employee, agent, contractor, or subcontractor of a person or entity listed in Paragraphs (A)-(E); and

(G) an employee, fiscal agent, case manager, or service coordinator of an individual employer participating in the consumer-directed service option, as defined by Section 531.051, Government Code.

(b) The executive commissioner by rule shall adopt definitions of "abuse," "neglect," "exploitation," and "an individual receiving services" for purposes of this subchapter and investigations conducted under this subchapter.

**Credits**
Added by Acts 1999, 76th Leg., ch. 907, § 31, eff. Sept. 1, 1999. Amended by Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 4.280, eff. April 2, 2015; Acts 2015, 84th Leg., ch. 860 (S.B. 1880), § 8, eff. Sept. 1, 2015; Acts 2015, 84th Leg., ch. 1272 (S.B. 760), § 16, eff. Sept. 1, 2015.

V. T. C. A., Human Resources Code § 48.251, TX HUM RES § 48.251
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Tab E

Vernon's Texas Statutes and Codes Annotated
  Human Resources Code (Refs & Annos)
    Title 2. Human Services and Protective Services in General
      Subtitle D. Department of Family and Protective Services; Child Welfare and
      Protective Services
        Chapter 48. Investigations and Protective Services for Elderly Persons and
        Persons with Disabilities (Refs & Annos)
          Subchapter I. Employee Misconduct Registry

V.T.C.A., Human Resources Code § 48.401

§ 48.401. Definitions

Effective: September 1, 2015
Currentness

In this subchapter:

(1) "Agency" means:

(A) an entity licensed under Chapter 142, Health and Safety Code;

(B) a person exempt from licensing under Section 142.003(a)(19), Health and Safety Code;

(C) a facility licensed under Chapter 252, Health and Safety Code; or

(D) a provider investigated by the department under Subchapter F or under Section 261.404, Family Code.

(2) "Commissioner" means the commissioner of the Department of Family and Protective Services.

(3) "Employee" means a person who:

(A) works for:

(i) an agency; or

(ii) an individual employer participating in the consumer-directed service option, as defined by Section 531.051, Government Code;

(B) provides personal care services, active treatment, or any other services to an individual receiving agency services, an individual who is a child for whom an investigation is authorized under Section 261.404, Family Code, or an individual receiving services through the consumer-directed service option, as defined by Section 531.051, Government Code; and

(C) is not licensed by the state to perform the services the person performs for the agency or the individual employer participating in the consumer-directed service option, as defined by Section 531.051, Government Code.

(4) "Employee misconduct registry" means the employee misconduct registry established under Chapter 253, Health and Safety Code.

(5) "Reportable conduct" includes:

(A) abuse or neglect that causes or may cause death or harm to an individual receiving agency services;

(B) sexual abuse of an individual receiving agency services;

(C) financial exploitation of an individual receiving agency services in an amount of $25 or more; and

(D) emotional, verbal, or psychological abuse that causes harm to an individual receiving agency services.

**Credits**

Added by Acts 2001, 77th Leg., ch. 1267, § 1, eff. Jan. 1, 2002. Amended by Acts 2003, 78th Leg., ch. 198, § 2.113, eff. Sept. 1, 2003; Acts 2009, 81st Leg., ch. 284, § 35, eff. June 11, 2009; Acts 2009, 81st Leg., ch. 763, § 15, eff. June 19, 2009; Acts 2011, 82nd Leg., ch. 91 (S.B. 1303), § 13.001, eff. Sept. 1, 2011; Acts 2013, 83rd Leg., ch. 363 (H.B. 2683), § 10, eff. Jan. 1, 2014; Acts 2015, 84th Leg., ch. 860 (S.B. 1880), § 10, eff. Sept. 1, 2015; Acts 2015, 84th Leg., ch. 1272 (S.B. 760), § 18, eff. Sept. 1, 2015.

V. T. C. A., Human Resources Code § 48.401, TX HUM RES § 48.401
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Tab F

Vernon's Texas Statutes and Codes Annotated
    Human Resources Code (Refs & Annos)
        Title 2. Human Services and Protective Services in General
            Subtitle D. Department of Family and Protective Services; Child Welfare and Protective Services
                Chapter 48. Investigations and Protective Services for Elderly Persons and Persons with Disabilities (Refs & Annos)
                    Subchapter I. Employee Misconduct Registry

V.T.C.A., Human Resources Code § 48.402

§ 48.402. Rules Relating to Reportable Conduct

Effective: April 2, 2015
Currentness

The executive commissioner may adopt rules to further define reportable conduct.

**Credits**
Added by Acts 2001, 77th Leg., ch. 1267, § 1, eff. Jan. 1, 2002. Amended by Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 4.289, eff. April 2, 2015.

V. T. C. A., Human Resources Code § 48.402, TX HUM RES § 48.402
Current through the end of the 2015 Regular Session of the 84th Legislature

End of Document                                        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Tab G

Vernon's Texas Statutes and Codes Annotated
Human Resources Code (Refs & Annos)
Title 2. Human Services and Protective Services in General
Subtitle D. Department of Family and Protective Services; Child Welfare and Protective Services
Chapter 48. Investigations and Protective Services for Elderly Persons and Persons with Disabilities (Refs & Annos)
Subchapter I. Employee Misconduct Registry

V.T.C.A., Human Resources Code § 48.406

§ 48.406. Notice; Judicial Review

Effective: June 19, 2009
Currentness

(a) The department shall give notice of the order under Section 48.405 to the employee alleged to have committed the reportable conduct. The notice must include:

(1) separate statements of the findings of fact and conclusions of law;

(2) a statement of the right of the employee to judicial review of the order; and

(3) a statement that the reportable conduct will be recorded in the employee misconduct registry under Section 253.007, Health and Safety Code, if:

(A) the employee does not request judicial review of the finding; or

(B) the finding is sustained by the court.

(b) Not later than the 30th day after the date the decision becomes final as provided by Chapter 2001, Government Code, the employee may file a petition for judicial review contesting the finding of the reportable conduct. If the employee does not request judicial review of the finding, the department shall send a record of the department's findings to the

Department of Aging and Disability Services to record in the employee misconduct registry under Section 253.007, Health and Safety Code.

(c) Judicial review of the order:

(1) is instituted by filing a petition as provided by Subchapter G, Chapter 2001, Government Code;[1] and

(2) is under the substantial evidence rule.

(d) If the court sustains the finding of the occurrence of the reportable conduct, the department shall forward the finding of reportable conduct to the Department of Aging and Disability Services to record the reportable conduct in the employee misconduct registry under Section 253.007, Health and Safety Code.

**Credits**
Added by Acts 2001, 77th Leg., ch. 1267, § 1, eff. Jan. 1, 2002. Amended by Acts 2009, 81st Leg., ch. 763, § 19, eff. June 19, 2009.

Footnotes

1      V.T.C.A., Government Code § 2001.171 et seq.

V. T. C. A., Human Resources Code § 48.406, TX HUM RES § 48.406
Current through the end of the 2015 Regular Session of the 84th Legislature

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Tab H

<<Prev Rule                                          Next Rule>>

# Texas Administrative Code

TITLE 40            SOCIAL SERVICES AND ASSISTANCE
PART 19            DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES
CHAPTER 711        INVESTIGATIONS IN DADS AND DSHS FACILITIES AND
                   RELATED PROGRAMS
SUBCHAPTER A       INTRODUCTION
RULE §711.19       How is neglect defined?

Historical                                                      Texas
                                                               Register

In this chapter, when the alleged perpetrator is an employee, agent, or contractor, neglect is defined as a negligent act or omission by any individual responsible for providing services to a person served, which caused or may have caused physical or emotional injury or death to a person served or which placed a person served at risk of physical or emotional injury or death. Neglect includes, but is not limited to, the failure to:

  (1) establish or carry out an appropriate individual program plan or treatment plan for a person served, if such failure results in a specific incident or allegation involving a person served;

  (2) provide adequate nutrition, clothing, or health care to a specific person served in a residential or inpatient program; or

  (3) provide a safe environment for a specific person served, including the failure to maintain adequate numbers of appropriately trained staff, if such failure results in a specific incident or allegation involving a person served.

**Source Note:** The provisions of this §711.19 adopted to be effective May 1, 2001, 26 TexReg 2755; amended to be effective January 1, 2004, 28 TexReg 11345

Next Page          Previous Page

Re-Query TAC Database          Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS

Tab I

<<Prev Rule                                                              Next Rule>>

# Texas Administrative Code

| | |
|---|---|
| TITLE 40 | SOCIAL SERVICES AND ASSISTANCE |
| PART 19 | DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES |
| CHAPTER 711 | INVESTIGATIONS IN DADS AND DSHS FACILITIES AND RELATED PROGRAMS |
| SUBCHAPTER O | EMPLOYEE MISCONDUCT REGISTRY |
| RULE §711.1402 | How are the terms in this subchapter defined? |

Historical                                                                                          Texas
                                                                                                        Register

---

The following words and terms when used in this subchapter, shall have the following meanings, unless the context clearly indicates otherwise:

(1) Administrative law judge--An attorney who serves as a hearings examiner and conducts an EMR hearing;

(2) Agency--An entity, person or facility as defined in §48.401(1), Human Resources Code;

(3) APS--The Adult Protective Services division within the Department of Family and Protective Services, which is authorized to conduct investigations of alleged abuse, neglect, or exploitation of certain adults under Chapter 48, Human Resources Code, and certain children under §261.404, Family Code;

(4) Commissioner--The commissioner of the Department of Family and Protective Services (DFPS) or the commissioner's designee;

(5) Department--The Department of Family and Protective Services;

(6) Designated perpetrator--A person determined by APS to have committed abuse, neglect, or exploitation who may be eligible for inclusion on the Employee Misconduct Registry, when the abuse, neglect or exploitation meets the definition of reportable conduct;

(7) Employee--A person who:

(A) works for:

(i) an agency, whether as an employee contractor, volunteer or agent; or

(ii) an individual employer participating in the consumer-directed service option, as defined by Government Code §531.051;

(B) provides personal care services, active treatment, or any other personal services to an individual receiving agency services, an individual who is a child for whom an investigation is authorized under Family Code §261.404, or an individual receiving services through the consumer-directed service option, as defined by Government Code §531.051; and

(C) is not licensed by the state to perform the services the person performs for the agency or the individual employer participating in the consumer-directed service option, as defined by Government Code §531.051;

(8) EMR--The Employee Misconduct Registry;

(9) EMR hearing--An administrative hearing offered to a person who has been found to have committed reportable conduct for the purpose of appealing the finding of reportable conduct as well as the underlying finding of abuse, neglect, or exploitation;

(10) Facility investigation--An investigation conducted by APS under Chapter 48, Subchapters F and H, Human Resources Code, that involves an employee of one of the following agency types:

(A) a home and community-based services (HCS) provider;

(B) a community center as defined in §531.002, Health and Safety Code;

(C) a licensed intermediate care facility for persons with intellectual disabilities and related conditions (ICF-IID);

(D) a local authority as defined in this chapter;

(E) the Rio Grande State Center;

(F) a state-supported living center; or

(G) a state hospital;

(11) HCSSA--A home and community support services agency, sometimes referred to as a home health agency, licensed under Chapter 142, Health and Safety Code;

(12) HCS--A person or an agency exempt from licensure under §142.003(a)(19), Health and Safety Code, that provides home and community-based services to persons with intellectual disabilities and related conditions;

(13) ICF-IID--An intermediate care facility for individuals with an intellectual disability or related condition. A licensed ICF-IID is a privately owned and operated facility licensed by the Department of Aging and Disability Services under Chapter 252, Health and Safety Code. A state supported living center operated by DADS or DSHS is also an ICF-IID. A local authority may also operate an ICF-IID;

(14) In-home investigation--An investigation conducted by APS under Chapter 705 of this title (relating to Adult Protective Services);

(15) Person served--An adult or child receiving services from an agency as defined in this subchapter;

(16) Reportable conduct--A confirmed or validated finding of abuse, neglect or exploitation that meets the definition in §48.401(5), Human Resources Code, and as further defined in §711.1408 of this title (relating to What is reportable conduct?);

(17) Rio Grande State Center--A facility operated by the Department of State Health Services that provides in-patient mental health services and services through an ICF-IID;

(18) State hospital--A hospital operated by the Department of State Health Services that provides in-patient mental health services; and

(19) State supported living center--An ICF-IID operated by the Department of Aging and Disability Services.

---

**Source Note:** The provisions of this §711.1402 adopted to be effective September 1, 2010, 35 TexReg 6835; amended to be effective September 1, 2012, 37 TexReg 6322; amended to be effective June 1, 2014, 39 TexReg 3878



Tab J

<<Prev Rule                                                 Next Rule>>

# Texas Administrative Code

| | |
|---|---|
| TITLE 40 | SOCIAL SERVICES AND ASSISTANCE |
| PART 19 | DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES |
| CHAPTER 711 | INVESTIGATIONS IN DADS AND DSHS FACILITIES AND RELATED PROGRAMS |
| SUBCHAPTER O | EMPLOYEE MISCONDUCT REGISTRY |
| RULE §711.1406 | How are the terms abuse, neglect, and financial exploitation defined for Facility investigations? |
| Repealed Date: | **08/14/2016** |

Historical                                                                                  Texas
                                                                                                        Register

---

(a) For Facility investigations, the definitions of abuse, neglect, and exploitation are contained in rules adopted pursuant to §48.251, Human Resources Code, and §261.404, Family Code. The following definitions apply:

  (1) "Abuse" includes physical abuse, sexual abuse, sexual exploitation, and emotional or verbal abuse, as those terms are defined in this section.

  (2) "Physical abuse" means:

   (A) an act or failure to act performed knowingly, recklessly, or intentionally, including incitement to act, which caused or may have caused physical injury or death to a person served;

   (B) an act of inappropriate or excessive force or corporal punishment, regardless of whether the act results in a physical injury to a person served; or

   (C) the use of chemical or bodily restraints on a person served not in compliance with federal and state laws and regulations (including the laws and regulations listed in §711.11(3) of this title (relating to How is physical abuse defined?).

  (3) "Neglect" means a negligent act or omission by any individual responsible for providing services to a person served, which caused or may have caused physical or emotional injury or death to a person served or which placed a person served at risk of physical or emotional injury or death. Examples of neglect are listed in §711.19(1) - (3) of this title (relating to How is neglect defined?).

  (4) "Sexual" abuse means any sexual activity, including but not limited to:

   (A) kissing a person served with sexual intent;

   (B) hugging a person served with sexual intent;

   (C) stroking a person served with sexual intent;

   (D) fondling a person served with sexual intent;

(E) engaging in with a person served:

(i) sexual conduct as defined in §43.01, Penal Code; or

(ii) any activity that is obscene as defined in §43.21, Penal Code;

(F) requesting, soliciting or compelling a person served to engage in:

(i) sexual conduct as defined in §43.01, Penal Code; or

(ii) any activity that is obscene as defined in §43.21, Penal Code;

(G) in the presence of the person served:

(i) engaging in or displaying an activity that is obscene as defined in §43.21, Penal Code; or

(ii) requesting, soliciting or compelling another person to engage in any activity that is obscene as defined in §43.21, Penal Code;

(H) committing sexual exploitation against a person served;

(I) committing sexual assault as defined in §22.011, Penal Code, against a person served;

(J) committing aggravated sexual assault as defined in §22.021, Penal Code, against a person served; and

(K) causing, permitting, encouraging, engaging in, or allowing the photographing, filming, videotaping or depicting of a person served if the employee agent or contractor knew or should have known that the resulting photograph, film, videotape, or depiction of the person served is obscene as defined in §43.21, Penal Code, or is pornographic.

(5) "Sexual exploitation" means a pattern, practice or scheme of conduct against a person served, which may include sexual contact, that can reasonably be construed as being for the purposes of sexual arousal or gratification or sexual abuse of any person; the term does not include obtaining information about a patient's sexual history within standard accepted clinical practice.

(6) "Financial exploitation" means the illegal or improper act or process of using a person served or the resources of a person served for monetary or personal benefit, profit or gain.

(7) "Verbal or emotional abuse" means any act or use of verbal or other communication, including gestures, to curse, vilify, or degrade a person served; or threaten a person served with physical or emotional harm. The act or communication must result in observable distress or harm to the person served or be of such a serious nature that a reasonable person would consider it harmful or causing distress.

(b) Notwithstanding any other provision in subsection (a)(4) of this section, which is the definition for "sexual abuse," consensual sexual activity between an employee, agent, or contractor, and an alleged victim is not considered sexual abuse if the consensual sexual relationship began prior to the employee, agent, or contractor becoming a paid employee, agent, or contractor.

**Source Note:** The provisions of this §711.1406 adopted to be effective September 1, 2010, 35 TexReg 6835; amended to be effective September 1, 2012, 37 TexReg 6322